Filed 7/20/16  P. v. Xiong CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TOU VANG XIONG,<br><br>    Defendant and Appellant. | F069721<br><br>(Super. Ct. No. 1405399)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Scott T. Steffen, Judge.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Tou Vang Xiong (defendant) stands convicted, following a jury trial, of two counts of premeditated murder in which he personally and intentionally discharged a firearm and proximately caused great bodily injury or death to Gao Yang and Nhia Yang (Pen. Code,[1] §§ 187, subd. (a), 12022.53, subd. (d); counts I & II), premeditated attempted murder in which he personally and intentionally discharged a firearm and proximately caused great bodily injury or death to Lee Pao Yang (§§ 187, subd. (a), 664, 12022.53, subd. (d); count III), and assault with a deadly weapon upon Xay Yang, during the commission of which he personally used a firearm (§§ 245, subd. (a)(1), 12022.5, subd. (a); count IV). His motion for a new trial was denied, and he was sentenced to fully consecutive indeterminate terms on counts I through III, and seven years in prison on count IV. He was also ordered to pay victim restitution, along with various fees, fines, and assessments.

On appeal, we hold: (1) The jury's findings of premeditation must be reversed due to the erroneous admission of evidence of defendant's postoffense conduct, but defendant's other claims of evidentiary error do not require reversal; (2) the trial court did not err by excusing a juror for illness; (3) the trial court acted within its discretion by denying defendant's posttrial motion for substitute counsel; and (4) defendant is not entitled to reversal of the conviction on count IV. We conditionally modify the judgment on counts I through III and remand the matter to the trial court with directions. We also order the correction of a clerical error with respect to the judgment on count IV. In all other respects, we affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

# FACTS

## I

### PROSECUTION EVIDENCE

### *The Charged Offenses*

As of July 20, 2009, Xay Yang resided in the 1700 block of Radley Place, Modesto.[2] Xay, who is Hmong, explained there are approximately eight last names in the Hmong culture. If two people share the same last name, they are automatically part of the same clan. It is considered taboo to date or marry someone from the same clan, even though blood ties, if any, may be very distant. Clan members refer to each other as cousins or, in the case of someone older, grandparent or aunt or uncle, even if they are not blood relations.

Nhia Yang was Xay's brother. As of July 20, he was living in a detached room behind dwelling A. The room had two doors and a small window, as well as electricity, but no kitchen or bathroom.

Xyeem Yang had known defendant for two months as of July 20. They were "[b]uddies." They lived together in Winton, along with Xyeem's "uncle," Bee Yang, Bee's son, and Gao Yang.[3] Gao and defendant had been going out as long as Xyeem had known defendant.

Lee Pao Yang lived in the same residential complex as defendant, and they became friends. As of July 20, they had known each other since Lee got out of jail,

---

**2** To avoid confusion, we refer to the Yangs and certain other individuals by their first names. No disrespect is intended. We also refer to the scene of the shooting, which was the address at which Xay lived, as dwelling A, and to the house directly across the street as dwelling B.

Undesignated references to dates in the statement of facts are to the year 2009.

**3** Bee was not really Xyeem's uncle, but Xyeem referred to him as such as a sign of respect. Xyeem had known Nhia most of his life, but was not sure if there was a close family relationship.

following a receiving stolen property conviction, in June. Gao, Lee's distant cousin, introduced them. Lee had known Nhia two or three weeks. Defendant introduced them. During the time they knew each other, Lee and defendant smoked crystal methamphetamine together approximately twice a day almost every day. Defendant furnished the drugs. Lee did not know where he got them, although he personally saw defendant sell drugs.

Around 5:00 or 6:00 Saturday evening, July 18, Xyeem, defendant, Gao, and Lee went to a party in Modesto. Lee did not want to go and said he had to attend an uncle's funeral in Sacramento, but defendant pointed a gun at him and said if Lee did not go with him, defendant was going to take Lee's "whole family to a different place." Defendant took what Xyeem believed to be an AR-15 firearm in the car with them. He said it was for protection, but did not say protection from what.[4] Xyeem did not remember what happened from the time of the party into the next day, because he was drinking. He did see Gao and defendant arguing for a little bit; however, this was typical of their relationship. Xyeem saw them arguing every day about their relationship. Both would yell and accuse the other of cheating. Then they would make up.

The group stayed at the party until early Sunday morning, July 19. They then went to Nhia's home, the detached room behind dwelling A. They all smoked methamphetamine, including Nhia, who had also been at the party.[5] At some point (Lee believed around 3:00 or 4:00 a.m.), everyone fell asleep. Xyeem was in the main house.

___

[4] In the past, Xyeem had seen defendant with a .357 revolver and a .380 pistol in addition to the AR-15.

According to Lee, defendant wrapped the AR-15 in a white towel and put it in the trunk just before they left for Modesto.

[5] Lee originally denied doing drugs to police because he was on probation. The five of them (Lee, Nhia, Xyeem, Gao, and defendant) smoked methamphetamine furnished by defendant on multiple occasions over the course of the weekend, although most of the times, Xyeem and Lee did not join in.

Lee slept on the couch in Nhia's room. Nhia slept on one bed. Defendant and Gao slept on the other bed.

Sunday morning, everyone woke and started going about their day. According to Lee, they all did drugs and then ate breakfast in the kitchen of the main house. According to Xyeem, defendant said something about people wanting to do "voodoo things" to him. Defendant, Gao, and Xyeem went out to buy food and go to the Buddhist temple.[6] It was defendant's idea to go to the temple. He wanted to be blessed. He said he thought there was a bad spirit in him and he wanted to get rid of it. After they left the temple, they bought some groceries, then went home and cooked.

Xyeem recalled that he, defendant, and Gao returned to Nhia's room and smoked some methamphetamine. At some point, Gao cooked, and they ate in the living room of the main house. They then returned to Nhia's room. This was Sunday night, July 19. Around 10:00 p.m. or midnight, defendant, Gao, and Nhia went to Walmart to get some clothes. After they returned, defendant and Gao argued about being possessed and cheating on each other. At some point, defendant pulled out a revolver, unloaded it except for one bullet, spun the cylinder, pointed it at Gao, and pulled the trigger. Defendant was smiling when he did it. Xyeem had seen defendant do the same thing two or three times when arguing with Gao. Because Gao and defendant were getting violent, Xyeem put the AR-15 between Nhia and the bed. He also told defendant to "be cool." Defendant "chill[ed] out" after that. The five of them — defendant, Gao, Xyeem, Nhia, and Lee — then smoked methamphetamine "a couple times." About two hours later,

---

[6] Nhia and Lee stayed home. Lee did not call the police at this time to report defendant had threatened his family, because he was afraid defendant would return, learn he had called from Nhia, who was defendant's best friend, and do something to Lee's family or shoot him.

Lee estimated defendant and Gao were gone until night, perhaps six or seven hours. Just before defendant, Gao, and Xyeem left, Lee saw defendant bring the AR-15 into Nhia's room. It was still wrapped in the towel.

around midnight or 1:00 a.m., Xyeem went to the front bedroom in the main house to sleep.

Lee recalled that defendant, Gao, and Xyeem returned around 8:00 or 9:00 p.m. Defendant brought some food and crystal methamphetamine into Nhia's room. Nhia cooked the food, and they all ate in that room. They all smoked some of the methamphetamine. Lee estimated the five of them had around four puffs each. After that, they just sat around and talked. This was around midnight. Lee was lying on the couch, texting his girlfriend on defendant's phone.[7] He was not paying attention to anything going on in the room.

Everyone went to bed between 1:00 a.m. and 2:00 a.m., with Lee, Nhia, defendant, and Gao bedding down in Nhia's room. As on the night before, defendant and Gao were on one bed, Nhia was on the other bed on the other side of the room, and Lee was on the couch. Xyeem was in the front house.

Sometime after everyone went to bed, Lee, who was still texting his girlfriend, heard defendant and Gao moving and whispering as they tried to have sex. Gao did not want to have sex while Lee and Nhia were in the room, and she and defendant started arguing. It was commonplace for them to argue; Lee estimated they argued about twice a week, and he basically ignored it.[8] This night, the argument went on and on. Lee tried to sleep, but had to use the bathroom and so he got up around 4:30 to 5:00 a.m. and entered the front house through the French door in the back. The lights were off in Nhia's room. Defendant and Gao had been loudly arguing for an hour or two. At no time that evening had Lee seen defendant pull a gun on Gao. At the time Lee left the room, the rifle was between defendant's and Nhia's beds.

---

**7**   Lee did not have a phone of his own. Defendant loaned him his.

**8**   Lee testified at the preliminary hearing that the relationship between the two was fine, and they argued once in a while, mostly over money and drugs.

Because he did not feel comfortable listening to Gao and defendant argue, Lee remained in the bathroom a good 15 to 20 minutes. When he returned, the lights were on in Nhia's room. Defendant and Gao were still yelling at each other. Nhia had gotten out of bed and was sitting on a chair. Gao was sitting on the bed. Defendant was holding the rifle. He was the only person in the room holding a weapon.

Gao and defendant argued for another five minutes or so, then defendant fired five shots into the ceiling by Nhia's bed. He was very angry. Everyone fell silent and looked at him. He then pointed the AR-15 directly at Gao, who put her hands up to try to protect her face, and fired three times without saying anything. The bullets struck Gao in the face, and she fell on the bed. Defendant then started to swing the gun at Lee, who was standing in the doorway, and Lee crouched and ran as gunfire came his way.

Lee ran around the house, then stopped to check if he had been hit. He realized he had been shot because blood was coming from his mouth.[9] He heard defendant say, "This is what you get, Nhia." Defendant sounded angry. Lee heard a couple of gunshots a couple seconds after defendant spoke, and he took off running again. He ran for several blocks, because he was scared of defendant chasing after him and killing him. He called 911 on defendant's phone.

On the night of July 19 and into the early morning of July 20, Xay, who was a fulltime student and also worked, was finishing up her homework in her room, which was adjacent to the walkway separating Nhia's room from the main house. She was completely sober.

Xay went to bed around 2:00 a.m. on Monday, July 20. She subsequently was awakened by a few loud pops that seemed to come from the direction of Nhia's room. She looked at the clock; it was 5:20 a.m. She heard Nhia say something like, "Hey,

---

**9** Lee was struck on the chin and both arms. He ultimately was hospitalized for two weeks as a result, and had to have surgery to have his chin reconstructed and his teeth repaired. Afterward, his jaw was wired shut for six months.

man," or "Eh, man." He seemed surprised and confused. His voice came from inside his room. Xay then heard three or four more shots.

Not realizing at the time she was hearing gunshots, Xay ran toward the French door, which was the only exit directly into the backyard, to see what was going on. She saw defendant standing on the walkway a couple of feet from the French door and four or five feet from the east entrance to Nhia's room. Defendant was holding a rifle and a handgun. He was pointing the rifle toward the east door of Nhia's room. He appeared cautious, as if he was still waiting for someone. He did not ask Xay for help or to call an ambulance. He told her, "You guys set these tigers on me," and that there were tigers everywhere.[10] She thought he meant actual people that were related to her, i.e., members of the Yang clan, as opposed to an animal with claws, because Hmongs usually used "tiger" to refer to someone the person disliked. "Tiger" was a common insult.[11] It could, however, refer to a supernatural being that was a menacing creature. At some point, defendant told Xay he was a shaman and was capable of seeing "these things."[12] Other than using the word "tiger," defendant seemed oriented to time and place. Xay believed defendant to be referring to people.

---

[10] Xay also reported defendant said, "You guys set these monsters on me."

[11] Xay explained that animals play a significant role in Hmong culture. Certain animals, like tigers, carry a negative connotation.

[12] Xay explained the Hmong people's cultural beliefs include a deep-rooted belief in the spiritual world. The Hmong perform rituals on a yearly basis to keep their spiritual being well. They also have shamans who are capable of communicating with the dead, and who do what is necessary to repair the living spiritual being. The spirits choose who will be a shaman, and while there are quite a few shamans in the Hmong population in Stanislaus County, it is common for people to claim to be shamans when they are not. In the Hmong culture, there is no designated place to go to worship, although Xay knew of Laos Temple in Ceres. If a person needs prayer or blessings, he or she goes to a shaman. Likewise, if a person feels he or she has an evil spirit inside, which is relatively common, he or she normally visits a shaman.

Defendant also demanded several times that Xay call his father. Xay truthfully told him the house phone could not make long-distance calls. She had a cell phone in her hand, but hid it from defendant because she did not want him to escape.

Defendant had Xay open the French door all the way so he could see inside. He pointed the handgun directly at her forehead from an inch or two away and told her to come outside. He told her "he had killed the two tigers, he killed them there," and he pointed to Nhia's room. He wanted her to take him home, and said if she did not help him, she would see what would happen. He pointed her to the room where the bodies were and forced her to go and look at them.

Xay went to the door of Nhia's room. Defendant kept the gun pointed at her the whole time. She looked inside and saw Nhia on the couch. He appeared to be dead. Defendant said there was a second body, but Xay did not see anyone else, as she could not see the whole room from just outside the door. Defendant asked Xay if she was scared. She told him yes. He seemed very proud of and boastful about what he had done.

Xay walked back toward the French door, while defendant backed up toward the fence. He made Xay swear she would help him. He made her raise her hand and swear upon the next generations and on the name of her recently deceased father, so that if she did not help him, she would be cursed. Defendant said if Xay did not help him, the next thousands of generations of Yangs would be cursed.[13]

Defendant said Xay had to drive him home, because then his family could help him. She said she could not do that without her purse and key, which were in her room. Defendant kept insisting that she take him home. He seemed in a hurry to get out of

---

[13] Xay explained curses are common in the Hmong culture. If someone does something wrong or does not live up to an agreement, the wronged person can put a curse on the wrongdoer. Swearing oaths and cursing are taken very seriously.

there, but refused to exit through the front door or the back gate. He then told her to address the tiger that had gotten away. Xay did not see anyone else around.

Xay kept telling defendant that he had to let her get her purse and key, which were in her room, or there was no way she could help him. He finally relented, then told her to open the front door so he could run through the house. Xay obeyed, then defendant told her to come back toward him and stay in the middle of the living room. He still had the gun pointed at her. He then quickly ran through the house and stopped by the passenger side of Xay's vehicle. Xay made it appear she was going toward her room, then ran to the front door and closed and locked it.

During the entire incident, which lasted about five minutes, Xay never saw anyone but defendant. He never described to her seeing something that was not really there.

As of July 20, Daniel Garza lived next door to dwelling B. Early that morning, he heard "a whole bunch" of gunshots coming from dwelling A. Looking out his front window, he saw a man holding some kind of rifle and a reddish blanket exit the front door of dwelling A. The person, whom Garza pointed out to the police when they arrived, went right across the street to dwelling B. He appeared to be walking normally. He stood in the front yard of dwelling B some eight to 10 minutes, until the police arrived. At one point, Garza heard him loudly say, "Open the door." When the police arrived, Garza heard the person say to them, "Kill me. Kill me," or "Shoot me. Shoot me."

The police received a call about the shooting at 5:25 a.m., from a neighbor who reported hearing four to five shots fired. In addition, Lee called 911. He reported he had been shot in the mouth and the arm, and he was hiding in the backyard of an abandoned house because defendant, whom he named (by nickname) as the shooter, was coming. Lee reported there were two other shooting victims still at the house, but he had run away and was bleeding to death. Lee said defendant had three guns.

10.

Multiple officers from the Modesto Police Department and deputies from the Stanislaus County Sheriff's Department responded to dwelling A. Officer Murphy was the first on scene, arriving at 5:32 a.m. Upon his arrival, he saw defendant, who matched the description of the suspect, standing in front of dwelling B. Defendant "frantically" told Murphy that his cousins had tried to kill him. When Murphy asked where they were, defendant pointed to dwelling A.

Officer Wesley arrived a short time later to find Murphy giving commands to defendant. Defendant, who was standing in the front yard of dwelling B, a few feet from the garage, was wearing nothing but boxer shorts. He was not holding any weapons. He came out to the officers as ordered and was placed in handcuffs. He seemed fairly calm, considering the circumstances.

Defendant was placed in the back of a patrol vehicle. Wesley sought to identify him, and defendant gave his name and date of birth. Defendant's answers were responsive to each question Wesley asked, and he appeared to be oriented to his current location. However, he told Wesley, "Officer, they tried to fucking kill me," followed immediately by something about black magic. He appeared nervous and agitated, although he was cooperative. All told, Wesley spent about a minute and a half with defendant. Wesley, who had received training in determining whether someone was under the influence, did not perform such an evaluation on defendant, and observed nothing to suggest defendant was impaired by methamphetamine.

Meanwhile, Officer Kroutil joined the search team that entered dwelling B based on information the suspect had fled to that address and possibly headed into the backyard. In clearing the garage, Kroutil discovered a Colt Sporter rifle, the civilian version of an M16, partially wrapped in a red towel under the minivan. The rifle had a 30-round magazine, meaning the weapon could carry 31 rounds if fully loaded. The weapon was empty. A red substance that appeared to be blood was on the barrel and fore end of the

11.

gun. A loaded Ruger revolver, from which two shots had been fired, was found in vegetation next to the door of the garage.

Kroutil then went back across the street to dwelling A. Inside the structure behind the house were a deceased male — Nhia — and female —Gao — both of whom had what appeared to be bullet holes and gross trauma from being shot at close range. There were shell casings and a live round on the floor. There were a lot of bullet holes in the walls, and some in the ceiling. Multiple baggies of methamphetamine were found throughout the structure. Also found was a glass pipe used for smoking methamphetamine.[14] A blood trail exited the structure and led to Lee, who was found several blocks away.

Nhia's autopsy revealed he had nine high-velocity-type gunshot wounds to the body, two of which entered from the back.[15] The range of fire for most of them was intermediate (meaning, assuming the weapon used was a rifle, the tip of the barrel was within two to three feet), although one of them, which was to the head and caused massive destruction of the skull and brain, was within inches. Nhia also had three blunt force injuries to the face that had a circular pattern consistent with a stabbing motion of a barrel of a rifle. There were signs the same type of injury occurred to the eye, which was collapsed but without signs of circular cuts. Two fairly intact projectiles were recovered during the autopsy. One, which was recovered from one of the shots to the back, came from the Ruger found in the vegetation outside the garage of dwelling B.

---

[14] Two days after the shooting, a gun was found between the mattresses of one of the beds in the room. It had after-market grips on it. A search of defendant's home in Winton turned up a photograph of defendant with a weapon in his waistband that appeared identical to the one recovered from the bed. Another photograph seized in the same search showed defendant with his arm around Gao's neck. In his hand was a Ruger revolver that was consistent with the Ruger recovered the morning of the shooting. Defendant appeared to be pointing the gun at the photographer.

[15] An AR-15 or M16, which are similar, would be considered high-velocity weapons.

The cause of death was multiple gunshot wounds. Most of the damage was to Nhia's head and upper abdomen, and most of the wounds were potentially fatal. Although the sequence of wounds could only be generalized, given the distance, it was probable the wounds to the torso were received first, then the one to the head was probably the last shot. Death would have occurred within seconds of that shot.

Gao's autopsy revealed five high-velocity-type gunshot wounds, two of which entered from the back. At least one, which hit the hand and then caused massive destruction to the flesh of the face and exited the throat, was a lethal wound. The cause of death was multiple gunshot wounds. Death could have occurred in minutes to an hour or slightly more.

Blood was drawn during each autopsy. Nhia's blood contained methamphetamine in a concentration of 1,180 nanograms per milliliter. Gao's blood contained methamphetamine in a concentration of 2,660 nanograms per milliliter. Dr. Carpenter, who performed the autopsies, explained that postmortem blood levels are "notorious for being inaccurate as to what the level was just prior to death," because the levels obtained from toxicology tests vary depending on the location from which the blood was drawn.

Blood was drawn from defendant at 10:27 a.m., approximately five hours after the shooting.[16] It contained methamphetamine in a concentration of 150 nanograms per milliliter. Daniel Coleman, a criminalist supervisor with the Department of Justice toxicology laboratory who analyzed defendant's blood, explained that if a person takes a drug over a long period of time, his or her tolerance increases and it takes more of the drug to produce the same effect. Coleman had run thousands of blood tests to quantify

---

[16]    Detective House of the Modesto Police Department was the lead investigator for this case. He transported defendant to the hospital to have blood drawn. Although House did not specifically evaluate defendant for being under the influence of a controlled substance, he believed, based on his training and experience, defendant might be under the influence; hence, the blood draw.

13.

the presence of methamphetamine. The highest level he had seen in someone still alive was around 2,000 nanograms per milliliter. The typical range for a person who would be considered under the influence for purposes of a violation of Health and Safety Code section 11550 would be 300 to 700 nanograms per milliliter, although it could be lower or higher for some individuals. A concentration of 10 to 50 nanograms per milliliter would be the therapeutic level, meaning the level at which the drug would be prescribed; 600 to 5,000 nanograms per milliliter would be the toxic level, meaning there would be negative effects; and a concentration of greater than 10,000 nanograms per milliliter would be fatal.

Coleman explained the concentration in defendant's blood would have been as of the time the blood was drawn. Although a number of variables affected how quickly drugs were eliminated from a person's body, the half-life of methamphetamine — the amount of time it took to reduce concentration by half — typically was six to 15 hours. There was, in essence, a "drug curve" entailing absorption, distribution, metabolism, and elimination of the drug, that represented the drug's concentration. Without information concerning where the person was in the process, concentration could not be extrapolated back in time to a point before the blood was drawn. If, however, a person consumed methamphetamine before being taken into custody, he or she was taken into custody no later than 5:33 a.m., his or her blood was drawn at 10:27 a.m., and the person's concentration was 150 nanograms per milliliter, Coleman would expect that person's concentration to be higher at 5:33 a.m. than at 10:27 a.m. How much higher would depend on a number of variables. In Coleman's opinion, it would likely be less than 300 nanograms per milliliter at 5:30 a.m. Although the person's concentration could have been 2,000 nanograms per milliliter or even higher at some point, it would have been earlier than 5:30 a.m. The higher the peak concentration, the longer it would take to get down.

14.

Carpenter placed Gao's and Nhia's methamphetamine concentrations in the toxic range, which potentially could start as low as 200 nanograms per milliliter. When people have methamphetamine levels in the toxic range, they can have "disturbing" side effects. These can include insomnia, excessive nervousness, loss of appetite, inability to control anger, and anything associated with hyperstimulation. The stimulation is called "fight or flight"; the body becomes very vigilant, and in fact more vigilant than desired. At extremely high levels, hallucination can be a side effect of methamphetamine ingestion. Methamphetamine is not normally a hallucinogenic, however.[17] Where methamphetamine is concerned, tolerance plays a role. If a person is a heavy methamphetamine user, his or her tolerance will be higher so it takes more of the substance to cause the same effect. Someone taking methamphetamine for the first time would be affected by side effects at a lower level than a continuous user of the drug. Methamphetamine in a concentration of under 200 nanograms per milliliter would be considered in the therapeutic range and was probably not a level likely to cause unwanted side effects. For a hallucinogenic side effect, the level would likely have to be high in the toxic range, although this would depend on the individual. Carpenter explained an individual's behavior cannot be predicted simply from his or her blood level because his or her tolerance is not known. He would not expect someone who used methamphetamine daily and whose level was 150 nanograms per milliliter to have side effects.

House interviewed defendant beginning shortly after 1:00 that afternoon.[18] Defendant was mostly calm, although he became angry on occasion. He was responsive

---

[17] Carpenter explained that "hallucinogenic" means the person develops loss of orientation to person, place, time, and situation; and may suffer delusions and visual and/or auditory hallucinations. It is a drug-induced psychosis that can occur on rare occasions in certain individuals with high levels.

[18] Portions of the video recording of the interview were played for the jury.

15.

for the most part, although sometimes he was evasive. House found him calculating and able to reason. He appeared to be oriented to time, place, and situation. Early in the interview, he expressed knowledge Gao had been shot. Over the course of the interview, defendant claimed he was angry about it, but did not appear to be emotionally upset, even though he said Gao was "the love of his life" and Nhia was his best friend.[19] He also said he considered Lee to be a brother.

House talked to defendant about Gao. Defendant said they had been dating approximately three to four months and were living together. He said he had been having some "bad vibes" from the Yang family about their dating. Defendant said he had known the Yangs since he was a young boy. He knew them from "[t]he street" and a gang he had been in. Defendant said he was a former member of the Orient LOCS, which had disbanded some time earlier.

In terms of his presence at dwelling A prior to the homicide, defendant initially said he was forced to go there. Although he was not definitive, he mentioned Nhia, Nhia's uncle, and Lee in that regard.

Defendant told House he had had sex with Gao the night before and gone to sleep, and he had been sleeping before the shooting. House repeatedly talked to defendant about the fact there were 17 or more gunshots from an automatic weapon and a .357 in that small room. Defendant said he had not heard the shots. He said he did not know why. He did say, however, that before going to sleep the night before, he had been "[h]ella tired."

Defendant said he woke to find Gao and Nhia shot dead. He picked up the guns, which he said were an AR-14 or AR-15 and a Ruger .357 revolver, and left the room. He said the rifle belonged to a friend of his whose name he could not remember, and the .357

---

**19** House knew Xyeem had told another detective that on the night before the homicides, Xyeem overheard defendant asking Gao why she did not love him anymore.

belonged to Nhia.  Defendant never claimed ownership of the guns, and repeatedly maintained he did not hear any gunshots.

Defendant related that after he left the room, he wanted to enter the front house to wake Xyeem.  He encountered Nhia's sister (whose name he did not know) at the back door of the main residence.  Defendant said he was "scared to death."  He said Nhia's sister asked him where he thought he was going.  Defendant said he was going to his cousin's house across the street.  He was unable to tell House the names of those cousins.  Defendant told the cousins there were "bad people . . . over there" and asked them for help.

At some point, House talked to defendant about Lee and whether he was present when defendant woke up.  Defendant said Lee was not there.  He knew, however, that Lee had been shot, even though, to House's knowledge nobody had told defendant this fact.  Defendant said he knew prior to the shooting that this event was going to occur.  Defendant said he counts backwards on his fingers and tends to know things when he does that.  He also said he prayed to God not to notice "these things," but that he did see ghosts.  He said he saw things and people did not believe him when he saw things.

During the course of the interview, which, as was typical of interrogations, skipped around, defendant said the .357 and rifle were the property of MOD (an Asian gang named Menace of Destruction).  Defendant said Lee was a member of MOD and had brought the weapons from Winton.  Defendant said Lee kept them at defendant's house in Winton.  Defendant said Lee had given him the .357 because he did not want defendant to feel pressured by Lee or Nhia or two males defendant did not know, but whom he identified as Menace of Destruction.  Defendant said he began to feel threatened by Nhia, Lee, and the two males, because they had the guns, and so he accepted the gun.

Defendant insisted he did not shoot or kill anyone.  He related that Xyeem went inside the main house to sleep, leaving defendant, Gao, and Nhia in Nhia's house.  Lee

17.

was also there, along with the two people defendant did not know. He guessed they were relatives of Nhia. Defendant said Xyeem was "dead asleep" and did not know anything. Defendant had told him a few months earlier that "bad shit[]" was going to happen in the back house. Defendant again denied killing anyone. He told House to ask Xyeem or Lee, as they knew the people's names. Defendant said he did not know what woke him up, but when he woke, he saw Gao lying dead. Asked by House who he thought shot her, defendant responded by asking whom House thought shot her, and saying House thought it was defendant. When House asked why defendant kept saying that when House had never said he thought defendant did it, defendant replied, "I can read right through your mind." Defendant implied Lee and the two unknown males shot Gao and Nhia.[20]

Defendant told House that when he woke up, Lee and the two other people were not there, although he saw people running. He did not know where Lee or the other two went, but when he got to his cousin's house, the gate was not closed.[21]

Defendant said he took the guns to his cousin's house across the street. He did not know what made him take them over there. His cousins did not want to open the door for him and told him to put the gun down. Defendant threw the rifle under the car in the garage and the other one on the grass in the front yard outside the garage. His cousins still would not open the door, and that was when the police came.

House talked to defendant about him wanting Xay to take him home. According to defendant, he told Xay that she needed to take him home. She then swore she would take him home. She told him she had nothing to do with hurting him and had no intention of hurting him. He said if that were true, why did she not let him go to his

---

[20]    Other than defendant's statement, House had no evidence anyone other than Lee, Gao, Xyeem, defendant, and Nhia were in the room that night.

[21]    Dwelling B had a driveway gate and possibly one at the side of the house.

cousin's house? She said no. She told him to put down the guns and he did. Defendant told her to call the police. She said Lee was hiding there in a bush.

At some point during the interview, House informed defendant that Lee had been shot and had identified defendant as the shooter. Defendant said this was a lie. He said Lee was a member of an opposing gang, but defendant nevertheless had taken him in, and tried to mentor him and keep him out of gangs. During this conversation, defendant referred to Lee as "a little snitch." He also said Lee had stolen some money from him, and he called Lee an "evil, mother fucker."

When House told defendant he was looking at two counts of homicide, defendant said he did not care. He also said something to the effect that those who had lied about him would be punished seven times worse. Also at some point, House mentioned that he told defendant two people were shot, and defendant seemed to think House was wrong. Defendant replied that five people were shot: Gao, Nhia, Lee, and the two people defendant did not know.

House talked to defendant about his drug use on the night before the homicide. Defendant said they had all used methamphetamine that night, and that he had taken "two hits." At first, defendant claimed someone forced him to take the drugs. Then he admitted everybody had been smoking methamphetamine that night. When House asked if those two hits could have affected defendant to the point he would not know what was going on, defendant said no, he just fell asleep. Asked if that was what crystal methamphetamine normally did to him, he again said no.

During the interview, defendant never said he was shooting at demons. When House talked to him about tigers, however, defendant said the Yangs were tigers and the Xiongs were bears.[22] Defendant said that was something that came from his culture and family tradition. In the old days, Yangs were called tigers because they would turn into

---

[22] There was a tiger on a door of Nhia's room.

tigers.  He did not know why Xiongs were called bears.  He said it would come back to them "seven times worser" because seven was the Yangs' favorite number.  Defendant acknowledged he and the Yangs both were Hmong.  He said most of the houses had a lot of "crazy shit," like stuff hanging around doors.  When House said he had been inside the house and there was a lot of cultural stuff with which he was not familiar, defendant replied:  "Culture stuff is just only one simple thing.  That's it.  You don't have things hanging — you know what I mean?  But then after — at the same time I ain't — I'm not going to go all that superstitious shit.  You know what I mean?  I'm just going to go about it is what it is."  Asked what superstitious stuff he was talking about, defendant replied, "I'm not going to talk about no superstitious stuff because this is real life.  This ain't just superstitious."  House asked why, then, he was using the term "tiger" at the scene.  Defendant explained it was what they called themselves and what they represented themselves as.

At no time during the interview did defendant say he saw something that was not really there.  He showed different emotions, including anger.  He changed his story during the course of the interview, sometimes adding information and sometimes taking information back.  He never admitted shooting anyone, and repeatedly denied doing so.  He denied telling his cousins across the street that he had killed the tigers.

At the end of the interview, defendant said something in a foreign language House assumed was Hmong.  House asked him what he said, but defendant would not respond.  Defendant was singing religious songs when House left the room.  House looked at the video recording later and observed defendant speaking when no one else was present.

*Defendant's Preoffense Conduct*

When Lee first met defendant, Lee considered him a "nice gentleman."  Lee's feelings changed two to three weeks before July 20.  Lee had been in custody for burglary and receiving stolen property.  He was outside his house, smoking a cigarette, when defendant came over and started smoking with him.  Defendant then pulled out a

20.

revolver, pointed it at Lee's forehead from an inch or two away, and said he had found out Lee was a snitch and did not like snitches. Defendant said Lee was a snitch because Lee's friends were locked up after Lee was. Gao intervened and told defendant to stop. She vouched for Lee, whom she said was like her little brother. Defendant then told Lee not to contact anybody, and to just associate with defendant. Defendant, who was a drug dealer at that time, was concerned Lee might snitch on him. Lee was contacting his probation officer as required, and defendant thought he was contacting the police about things.

On another occasion, Lee and his cousins were playing video poker at defendant's house. Defendant was not home at the time. When defendant returned from the store and saw everyone sitting there, however, he went straight to his room and grabbed an AR-15 rifle. He then came into the living room and started pointing it at everyone. He accused them of planning to kill him or something. He blamed Lee because the others did not like him.

On yet another occasion about two to three weeks before July 20, defendant accused Lee's cousin, Na, of stealing money from him (defendant). Defendant pulled the same revolver he had pointed at Lee, and pointed it at Na's leg. Defendant pulled the trigger five times, but the gun just clicked instead of firing.[23] Defendant told Na he was lucky.

<em>Defendant's Postoffense Conduct</em>[24]

On May 31, 2010, Deputy Silva was working on the third floor of the Stanislaus County Men's Jail. The third floor was the "max floor." That day, Silva was escorting inmates to and from the shower. He had the door to defendant's cell halfway open when defendant ran out of the cell, carrying a spear that was at least one to two feet long, and

---

[23]   Lee did not know whether it was loaded.

[24]   This evidence was admitted during the People's rebuttal case.

21.

headed in the opposite direction from the showers. He ran to a cell several cells from where he was housed, stood in front of it, and began jabbing his spear into the cell. Inmate Jackson was in the cell at the time. Silva radioed for assistance; once another officer arrived and both officers pointed their Tasers at defendant, defendant complied with orders to drop the weapon and lie on the ground. When Silva handcuffed defendant, he discovered defendant had a sharpened toothbrush attached to his left arm with elastic from the waistband of his underwear.

On May 2, 2013, Deputy Maxwell was working on the second floor of the jail, where defendant was housed. Maxwell was "conducting showers." As he opened defendant's cell, defendant ran in the opposite direction from the shower, holding a large spear constructed of jail-made paper with a screw at the end. He ran several cells down and started repeatedly thrusting it into the cell where inmate Hunter and another inmate were housed.

On July 19, 2013, Deputy Fay was working at the jail. At approximately 2:35 p.m., Fay was escorting inmate Salgado down the jail tier called "private singles." When Fay and Salgado passed defendant's cell, defendant reached out and grabbed Salgado by the jumpsuit. Almost simultaneously, defendant's cellmate, inmate Phommahaxay, threw a spear out of the cell. Although Fay pulled Salgado away, Salgado sustained a small cut to his ear. An administrative hearing was held as a result of the incident. Defendant was found guilty of disruptive conduct and interference with staff duties and responsibilities. He was found not guilty of battery on an inmate, assault of an inmate, possession of weapons, violation of inmate rules, and violation of criminal law.

On August 28, 2013, Deputy Fittje was working on the third floor of the jail. At approximately 5:40 that morning, he and his partner on the floor were "conducting showers" on the private singles tier. When Fittje let defendant and his cellmate, inmate Phommahaxay, out of their cell to walk to the showers, they ran two cells down. Defendant was holding a jail-made spear. Defendant threw the spear through the cell

22.

bars in an attempt to assault inmate Naylor. Fittje and his partner drew their Tasers, pointed them at defendant and Phommahaxay, and ordered them back to their cell. The two complied.

## II

### DEFENSE EVIDENCE

Bai Xiong was defendant's sister. She knew Gao from the time defendant started dating her. Bai saw Gao and defendant, who were always together, every day. Bai and defendant were very close, and Gao and defendant loved each other a lot. Bai never saw them fight. A couple of weeks before the shooting, however, Bai started seeing defendant less, perhaps only three times a week. He was using "a lot" of crystal methamphetamine and separating himself from family.

A month or so before the shootings, defendant exhibited hallucinatory behavior to Bai. He started acting "really crazy" and talking about seeing people and seeing his best friend who had passed away. He was scared and always thought someone was after him.[25]

Defendant was once married to a woman named Farm. Their relationship initially was a happy one. On one occasion, Bai saw Farm and defendant in a verbal argument that escalated to the point that Farm chased defendant with a knife. Defendant ran from Farm. The marriage ended in divorce, which "really upset" defendant.

As of July 20, Lee Moua was living in dwelling B. That morning, he heard the window opening. He saw defendant carrying two guns. Moua and defendant talked for a little over two minutes. Defendant appeared to be "abnormal." Defendant told Moua to call defendant's father. He sounded anxious. There was a house cat close to his feet. Defendant tapped the cat away with his foot and asked Moua why he was raising tigers.

---

**25** Modesto Police Detective Pouv interviewed Bai in the course of investigating the shootings. According to Pouv, Bai told him defendant did not have any issues with respect to alcohol or drug abuse or mental instability.

23.

Defendant did not point the gun at the cat. He did not point the gun at Moua, although he made a motion with the gun and was yelling when he was telling Moua to call his father. Defendant was not threatening, but rather "like he was abnormal."

Neng Yee Lee had been a shaman for approximately 40 years, first in Laos and then in the United States. He explained that a shaman is someone who helps "litigate" problems in the spirit world, i.e., when people get involved with the spirits. There are several types of spirits in the spirit world. There are the wild spirits that lived in the wild. There are also warrior types of spirits. If people get "tangled" with the warrior types, they will have problems and the shaman will have to deal with them. Spirits sometimes take animal forms, normally the form of tigers. Tiger spirits will make a family sick, and if the shaman does not perform certain rituals, the family could possibly die. These are not real tigers, but spirits. If someone does not have a problem, the tiger spirits will be peaceful. If someone has a problem, however, they will not be. Shamans and even some ordinary people are capable of seeing spirits. Neng Yee Lee himself had seen them in Laos. They also exist in the United States.

Mong Vang considered defendant to be one of his best friends. Vang last saw him at defendant's residence in Winton. Gao, Lee, and Xyeem were also present. They left for a party in Modesto, but Vang did not go with them. He was asked to come to the party "in a kindly way," but did not go because he had to pick up his wife from work. Vang heard a conversation between Lee and defendant. All defendant asked Lee was, "Do you want to go?" It was "a kindly conversation"; everybody was joking. Defendant did not pull a gun on Lee. Although Vang had seen defendant holding a rifle once or twice and had seen defendant with two different types of guns, he did not see any guns that night.

Dr. Alex Yufik, a board-certified forensic psychologist with a law degree whose private practice and employment consisted of assessing, evaluating, and treating substance use disorders, including methamphetamine, and who had specific training and

24.

experience with respect to methamphetamine psychosis, testified as an expert on methamphetamine-induced psychosis. He explained that methamphetamine use causes hyperalertness, tachycardia, excessive sweating, and a sense of euphoria. Later, additional symptoms occur, such as loss of capacity to plan or organize behavior and paranoia.

Yufik explained that addiction is a chronic, progressive, and potentially fatal brain disease. Once a person becomes addicted, it becomes a brain disorder, and the subsequent behavior is the product of defective brain tissue. Use of methamphetamine over a period of time actually changes the user's brain, and the changes become worse with prolonged use. Methamphetamine affects brain chemistry and so causes functional impairment. It affects the portion of the brain responsible for executive functioning, i.e., planning, judgment, and organization.[26] In some cases, the user starts to develop psychotic symptoms, meaning he or she loses touch with reality, because methamphetamine has "hijacked" the dopamine system. It has rewired the circuitry of the brain and changed the neurological dopamine release/reward system. It also causes actual structural changes that can be seen on a brain scan. The brain starts to lose its ability to process dopamine, meaning the person is no longer able to experience normal pleasure. He or she then seeks out the drug, because that is the only way he or she is able to experience the dopamine and its reward system.

Yufik explained that a drug abuser using methamphetamine will experience a clinically significant reduction in dopamine, because the relevant part of the brain has been damaged. In severe cases, that translates into psychotic behavior, with "psychotic"

---

[26]     Yufik gave the example of someone planning a party, which requires planning, organization, and deliberation. The person actually has to think about the components — how much money to budget, how many people to invite, where to hold the event, and the like — in order to execute them. A person with an impairment in the prefrontal cortex, which is the portion of the brain affected by methamphetamine use, will not be able to carry out a complex series of behaviors like that.

meaning the person loses touch with reality. The person may start to develop paranoid delusions, believing people are trying to hurt or kill him or her without a basis in reality. The person sometimes begins to experience hallucinations, something the person sees, but nobody else does. The person may see ghosts, demons, or angels that are not real.[27] He or she may also experience auditory hallucinations, i.e., the hearing of voices coming from within the person's own brain. The person cannot distinguish between voices coming from the outside and within the brain, and starts to respond to the internal voices. These are classic symptoms of methamphetamine-induced psychosis.[28]

Yufik explained there can be other causes of psychosis, such as schizophrenia, the hallmark of which is losing touch with reality. Unlike with schizophrenia, however, once a person with methamphetamine-induced psychosis stops using the drug, the psychotic symptoms disappear over a period of time, the length of which depends on the individual. In the schizophrenic person, the symptoms remain. Thus, there is a correlation between methamphetamine and methamphetamine-induced psychosis: If a person has no methamphetamine in his or her system, he or she cannot have methamphetamine-induced psychosis.

Yufik testified that sometimes the hallucinations experienced as a result of methamphetamine use result in violence, though not always. According to Yufik, there is a very complex relationship between the amount of methamphetamine a person ingests on a particular occasion and whether that person is going to commit violence. A recent

---

**27** Yufik defined a hallucination as "a distortion in reality where a person sees things that aren't really there." If a person said there were tigers everywhere and there were, in fact, no tigers present, that could be evidence of a hallucination. Similarly, if a person said, "You set these tigers upon me," and there were, in fact, no tigers set upon that person, that could be evidence of a hallucination.

**28** Yufik admitted testifying in an earlier case that when speaking of methamphetamine, it was more common for the person to interpret reality as threatening, as opposed to hallucinating.

study showed there is no statistical significance between how much is ingested and whether the person has psychotic symptoms. As for correlation between prolonged use of methamphetamine and the development of psychotic symptoms, Yufik explained there is some evidence in the research that suggests prolonged use is more likely to result in development of psychosis, but not necessarily. A person can have prolonged use but not develop psychotic symptoms, because not every brain processes the drugs exactly the same and so there is an issue of individual vulnerability.

Yufik also testified that methamphetamine is correlated with violence. He explained the rate of violence is nine times higher in people who use methamphetamine than in people who use other drugs. He further explained that when a person takes methamphetamine, he or she experiences impulse control problems. Ordinarily, there is a kind of barrier that allows a person to decide whether to delay an impulse. When that barrier is removed, as it is when methamphetamine is used, the person simply acts on impulse, because the control center is impaired.

Yufik performed a forensic evaluation on defendant. He was asked to determine whether defendant had a mental illness or a substance abuse; if so, whether that substance abuse was related to methamphetamine; and, if so, what role methamphetamine played in his behavior and alleged criminal actions. To this end, Yufik reviewed all the materials defense counsel provided, which included police and witness reports, transcripts of the witness reports, the autopsy photographs, crime scene photographs, Dr. Sims's psychological report, the autopsy report, the video recording of defendant's interrogation, and defendant's toxicology report.[29] Yufik then met with defendant in jail for five and a half hours. During this time, Yufik conducted a clinical interview, which in addition to observing defendant's behavior, involved asking defendant about such things as his

---

[29]     Dr. G. Preston Sims, a forensic psychologist, was appointed by the court to evaluate whether defendant met the criteria for legal insanity under California law. For various reasons not pertinent to this appeal, the evaluation was not ordered until 2013.

background and clinical history. Yufik also conducted forensic testing, which involved administering several psychological tests. His evaluation included consideration of whether defendant was malingering. Yufik then reviewed the relevant literature.

Based on all the information available to him, Yufik concluded defendant had substance abuse disorder as that diagnosis was given in the Diagnostic and Statistical Manual, fifth edition (DSM-V). The criteria were cravings, withdrawal symptoms, and continuing to use the substance despite negative consequences. He also concluded, to a reasonable degree of psychological certainty, defendant was under the influence at the time of the offense.

Yufik explained "malingering" means the person is deliberately trying to fake something, usually the existence or absence of a mental illness. There are standardized psychological tests to help determine whether someone is malingering, and Yufik administered two of them — the Personality Assessment Inventory (PAI) and the Miller Forensic Assessment Tool (M-FAST) — to defendant. After administering these tests, Yufik formed the opinion defendant was not malingering during Yufik's psychological evaluation of him.[30]

According to Yufik, methamphetamine-induced psychosis is a symptom of the mental illness of methamphetamine abuse. To evaluate someone for methamphetamine-induced psychosis, Yufik looked at the totality of the circumstances to see if the person showed symptoms thereof. He also ruled out alternative hypotheses.[31] In defendant's

---

[30]    Because there was no indication defendant was fabricating a memory impairment, Yufik did not administer the test of memory malingering (TOMM). Yufik also did not administer the WASI or MMPI-2 tests, which were not necessarily relevant for methamphetamine-induced psychosis.

Yufik explained that the tests for malingering are designed to find a particular pathology of a person. Someone could lie to the evaluator and not necessarily be labeled a malingerer.

[31]    The fact someone claimed to see dead people did not necessarily mean he or she was suffering from some type of psychosis.

28.

case, Yufik also had information defendant had a severe personality disorder independent of any methamphetamine psychosis. Impulsiveness, irresponsibility, acting without due consideration of others, disrespecting societal customs, and manipulation were traits of this personality disorder.

Based on his psychological evaluation, Yufik concluded, to a reasonable degree of psychological certainty, defendant had methamphetamine-induced psychosis during the relevant time period surrounding the killings. To some degree, it was the combination of the substance abuse disorder and the antisocial personality disorder that created the methamphetamine-induced psychosis in defendant's case.

## DISCUSSION

### I

### EVIDENTIARY RULINGS

Defendant contends the trial court committed reversible error in three of its evidentiary rulings: prohibiting Sims from testifying to his own opinion that defendant was not malingering, admitting evidence of defendant's postoffense bad acts (the jail incidents), and admitting evidence of defendant's preoffense threats and assaults with a gun on people other than Gao. We conclude it was error to admit evidence of the postoffense jail incidents. Although any error in admitting defendant's preoffense acts or precluding Sims from giving his own opinion on malingering was harmless, admission of the postoffense incidents was prejudicial with respect to the jury's findings of premeditation on counts I through III.

### A.    Background

In anticipation the defense would seek to introduce evidence defendant suffered some form of " 'diminished actuality' " and could not form the specific intent to kill, the People moved, in limine, for admission of specific acts of conduct by defendant pursuant to Evidence Code section 1101, subdivision (b), as impeachment or rebuttal. Although the prosecutor did not describe the acts in his written motion, he contended they were

29.

sufficiently similar to the charged offenses (in that they involved assaultive behavior) so as to show intent, and that they were relevant to impeach or rebut defendant's mental state claim.**32**

At the hearing on the motion, the prosecutor argued defendant had put his mental state in issue by his methamphetamine-induced psychosis defense. The prosecutor argued the postoffense incidents were "very relevant" to show defendant's intent, as well as absence of mistake; hence, they were admissible under Evidence Code section 1101, subdivision (b). Defense counsel responded that if the defense's argument was that defendant was not a violent person except when he took methamphetamine, the incidents would be relevant. That was not, however, the defense's theory of the case. Rather, the defense's theory concerned what was going on in defendant's mind specifically at the time of the charged offenses, with the mental state evidence being offered to show the absence of malice and premeditation. Defense counsel also asserted the evidence of the jail incidents would be extremely prejudicial, as it showed a propensity to commit violence; moreover, it would be cumulative in light of the uncharged preoffense acts already admitted by the court. The prosecutor argued the proffered evidence involved the same class of crimes as the charged offenses — assaults using weapons — so as to be admissible to show intent, and he stated his belief it was "extremely probative." He interpreted the defense as being "[i]t's the meth that made me do it."

The trial court ruled the evidence was admissible. It stated: "I think that the violent nature of the acts is relevant to show that the Defendant was not acting simply as a result of meth-induced psychosis at that one particular time [i.e., the time of the charged offenses]." The court precluded the prosecutor from questioning defendant about the jail

---

**32**    The trial court received reports from the jail on the postoffense incidents in connection with the hearing on whether defendant should be shackled during trial.

incidents unless defendant testified he was not a violent person, but gave the prosecutor permission to introduce them in rebuttal.[33]

The prosecutor subsequently cross-examined Yufik about whether, if a person were to exhibit violent behavior after an event and no methamphetamine use was involved, it would factor into Yufik's opinion whether the person acted under methamphetamine-induced psychosis at the time of the charged offense, or whether such conduct was simply part of the individual's personality. Yufik testified that if a person was not abusing methamphetamine at a certain point, then methamphetamine would not play a role in the aggression. Asked if having information the person was violent after the event would be pertinent to his diagnosis concerning the actual event, Yufik replied it would be pertinent only to the extent of the antisocial personality diagnosis. Yufik did not think it would change his opinion with respect to the date of the event to learn the person made a weapon in jail and attempted to attack people with it on a couple of occasions, because there were many people who committed violent crimes that had nothing to do with methamphetamine.

Defense counsel later argued the prosecutor had already gotten into the issue of the jail incidents in his cross-examination of Yufik, and so the incidents themselves were cumulative and more prejudicial than probative. Counsel stated: "Again, I can't make this clear enough. It is not our argument that [defendant] is only violent on meth[amphetamine]. If it were, instances of him being violent not on meth would absolutely be relevant. [¶] It is our argument that he couldn't form the requisite, mental intent on this specific day with that specific stimuli." The prosecutor argued the four incidents would show absence of mistake or intent, and he made an offer of proof as to what the testimony would be as to each. Defense counsel responded that the evidence

---

[33]  At the time of the ruling, it was anticipated defendant would testify. Ultimately, he did not.

was very relevant to show propensity, but propensity was not a proper basis for conviction.

At defense counsel's request, the court directed the prosecutor to sanitize the testimony concerning one of the incidents, so that the jury would not learn it involved the throwing of feces, albeit not by defendant. The court ruled the incidents were otherwise admissible as being inconsistent with the defense defendant was not able to form intent and also to show absence of mistake. Defense counsel clarified that his position was not that defendant could not form an intent, but rather that defendant could not form the requisite intent on that particular day, and so the postoffense incidents were irrelevant. The trial court stated it understood, and warned the prosecutor that he was taking a risk by introducing the evidence, but declined to change its ruling.

Just prior to presentation of the testimony concerning the jail incidents, the trial court admonished the jury: "Ladies and gentlemen of the jury, you will hear evidence that the Defendant committed certain, uncharged offenses. You may consider this evidence only in considering whether the Defendant formed the intent to kill on July 20th, 2009, and whether the acts on July 20, 2009 were the product of a mistake, but you are not to consider this evidence for any other purpose."[34] Testimony was then presented concerning the postoffense jail incidents, as summarized in the statement of facts, *ante*.

During the course of its postevidentiary giving of instructions to the jury, the court reminded jurors evidence had been admitted during trial for a limited purpose, and they could consider that evidence only for that purpose. The court also instructed, specifically with respect to the People's presentation of evidence of uncharged offenses:

> "If you decide the Defendant committed the offenses, you may, but are not
> required to consider that evidence for the limited purpose of deciding

---

[34] At some point, defense counsel argued in chambers that a limiting instruction could not cure the harm caused by the jury hearing the information.

32.

whether or not the Defendant acted with the intent to kill required for murder in this case, or the absence of mistake.

"In evaluating this evidence, consider the similarity, or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose, except for the limited purpose of determining whether the Defendant had the requisite, mental intent or absence of mistake at the time of the killing of Gao Her Yang and Nhia Yang, and the attempted murder of Lee Pao Yang. Do not conclude from this evidence that the Defendant has a bad character or is disposed to commit crime.

"If you conclude the Defendant committed the uncharged offenses, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient, by itself, to prove that the Defendant is guilty of the crimes alleged in this case. The People must still prove every charge beyond a reasonable doubt."

As previously stated, the jury returned verdicts of premeditated murder on counts I and II, and premeditated attempted murder on count III. In so doing, they rejected the lesser offenses of second degree murder and involuntary manslaughter as to counts I and II, and of unpremeditated attempted murder as to count III. They also necessarily found defendant acted with express malice — the specific intent to kill — as to counts I through III, although they were also instructed on the concept of implied malice, and that they could consider evidence of the defendant's voluntary intoxication in deciding whether he acted with an intent to kill or with deliberation and premeditation.

Prior to sentencing, defendant moved for a new trial on the ground admission of his postoffense conduct deprived him of a fair trial, because it amounted only to impermissible propensity evidence, was not relevant, and was more prejudicial than probative. The People opposed the motion, essentially reiterating their argument for admissibility under Evidence Code section 1101, subdivision (b), and contending, under Evidence Code section 352, there was no danger of creating confusion for or misleading the jury. The trial court denied the motion.

**B.** **Analysis**

33.

"The general framework for the admission of evidence as it relates to defendant['s] challenge[] is as follows. Only relevant evidence is admissible. [Citation.] Relevant evidence is broadly defined as that having a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case. [Citation.] Inferences drawn from the evidence must be logical and reasonable, not merely speculative. [Citations.] All relevant evidence is admissible, unless a specific statutory or constitutional provision bars its admission. [Citations.] If evidence is relevant and admissible for one purpose, but inadmissible if considered for another purpose, the trial court must admit it but, upon request, limit its proper scope and so instruct the jury. [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

Insofar as is pertinent here, subdivision (a) of Evidence Code section 1101 renders "evidence of uncharged crimes . . . inadmissible to prove the defendant had the propensity or disposition to commit the charged crime[s]. [Citations.]" (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238; accord, *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 405-406.)[35] The provision " 'expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' [Citation.]" (*People v. Bryant, Smith and Wheeler*, *supra*, at p. 406; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1257.)

"Because [Evidence Code] section 1101[, subdivision ](a)'s prohibition against propensity evidence is 'absolute where it applies' [citation]" (*People v. Villatoro* (2012)

---

**35** Subdivision (a) of Evidence Code section 1101 states: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

54 Cal.4th 1152, 1161-1162), " '[t]he inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory or relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 373.) " 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.' [Citations.] ' "The natural and inevitable tendency" ' is to give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge. [Citations.]" (*People v. Hendrix*, *supra*, 214 Cal.App.4th at p. 238.) The purpose of the statutory prohibition "is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history. [Citation.]" (*People v. Aeschlimann* (1972) 28 Cal.App.3d 460, 473.)

The prohibition codified in subdivision (a) of Evidence Code section 1101 is qualified by subdivision (b) of the statute, which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent, preparation, . . . knowledge, . . . absence of mistake or accident, . . .) other than his or her disposition to commit such an act."[36] "Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or

---

**36**  Evidence Code section 1101, subdivision (b) evidence is often described as "prior offenses," "prior bad acts," or "prior misconduct." In actuality, the conduct admitted under the statute "need not have been prosecuted as a crime, nor is a conviction required. [Citations.] The conduct may also have occurred after the charged events, so long as the other requirements for admissibility are met. [Citation.] Specifically, the uncharged act must be relevant to prove a fact at issue [citation], and its admission must not be unduly prejudicial, confusing, or time consuming [citation]." (*People v. Leon* (2015) 61 Cal.4th 569, 597-598.)

intent. [Citation.] On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion. [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) " 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.]' [Citations.]" (*People v. Hendrix*, *supra*, 214 Cal.App.4th at p. 239.)

In the present case, the prosecutor proffered the evidence concerning the postoffense jail incidents as relevant to intent and absence of mistake. However, "admission of other crimes evidence cannot be justified merely by asserting an admissible purpose." (*People v. Guerrero* (1976) 16 Cal.3d 719, 724.) "The question remains as to 'whether the particular evidence of defendant's other offenses *here* offered is logically relevant to prove the defendant's intent *in this case*.' [Citation.]" (*People v. Thompson* (1980) 27 Cal.3d 303, 319, fn. omitted, disapproved on another ground as stated in *People v. Rowland* (1992) 4 Cal.4th 238, 260.)

The relevance of an uncharged act "depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact. [Citation.]" (*People v. Leon*, *supra*, 61 Cal.4th at p. 598.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the

inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)**37**

Even when the evidence is viewed in the light most favorable to the trial court's ruling, as is appropriate when reviewing the admission of uncharged misconduct under Evidence Code section 1101, subdivision (b) (see *People v. Carter* (2005) 36 Cal.4th 1114, 1148; *People v. Kipp*, *supra*, 18 Cal.4th at p. 370), it is readily apparent that the only similarities between the charged offenses and defendant's misconduct in jail were that both sets of acts involved assaultive behavior and the use of some kind of weapon. If the fact the charged and uncharged offenses involved the same classes of crimes constituted sufficient similarity to render the uncharged offenses admissible on intent, as the prosecutor here seems to have believed, uncharged murders would always be admissible, at least insofar as Evidence Code section 1101, subdivision (b) was concerned, as evidence of a defendant's intent with respect to a charged murder. Such is clearly not the case. (See, e.g., *People v. Rogers* (2013) 57 Cal.4th 296, 327-328 [examining common and distinctive features between charged murder and out-of-state murders in reviewing trial court's admission of uncharged murders on element of intent as to charged murder].)

The fact defendant engaged in assaultive behavior with a weapon while in jail anywhere from 10 months to more than four years after the charged offenses was relevant to defendant's propensity/disposition for violence. Defendant's intent or absence of mistake during the jail incidents was not in issue. The evidence had no tendency in reason to prove any fact of consequence concerning the charged offenses other than propensity or disposition, or to disprove defendant's defense.**38** Under the circumstances,

---

**37** In terms of the requisite similarity, absence of mistake is analyzed like intent. (*People v. Burnett* (2003) 110 Cal.App.4th 868, 881.)

**38** Significantly, Yufik testified — without contradiction — that when a person's psychosis is induced by methamphetamine use, the psychotic symptoms disappear over a

37.

the evidence of defendant's postoffense jail misconduct was probative solely of his propensity to commit violent acts and/or his violent disposition. The prosecutor's argument for admissibility, which mischaracterized the nature and scope of the defense, and trial court's ruling, that the violent nature of the uncharged acts was relevant to show defendant was not acting simply as a result of methamphetamine-induced psychosis at the time of the charged offenses, underscore this conclusion. In essence, both the prosecutor and the court took the position the uncharged misconduct was admissible to show defendant was inherently violent. Such use of the evidence was categorically barred by Evidence Code section 1101, subdivision (a). (See *People v. Douglas* (1990) 50 Cal.3d 468, 510, disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)[39]

We turn to the question of prejudice. Not surprisingly, defendant claims the error violated his federal constitutional right to due process.

"To prove a deprivation of federal due process rights, [defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due

---

period of time once the person stops using the drug. There was no evidence defendant continued to use methamphetamine while in jail.

[39]    "Subdivision (a) [of Evidence Code section 1101] does not permit a court to balance the probative value of the evidence against its prejudicial effect." (*People v. Thompson*, *supra*, 27 Cal.3d at p. 317.) Accordingly, we need not assess the trial court's implied determination the evidence was admissible under Evidence Code section 352. (See *People v. Thompson*, *supra*, at p. 318.)

process." [Citation.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230, fn. omitted; accord, *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.)

Prosecutors have no right to overprove their cases or present all the evidence they have. (*People v. Williams* (2009) 170 Cal.App.4th 587, 610.)[40] It should have been clear the evidence of the jail incidents was relevant only to defendant's propensity for violence and, hence, inadmissible, and the prosecutor should have refrained from proffering it. Had the trial court carefully assessed the purpose and prejudicial nature of the evidence (see *People v. Tran* (2011) 51 Cal.4th 1040, 1049; *People v. Williams*, *supra*, at pp. 610-611), we are convinced it would have excluded the postoffense jail incidents.

Nevertheless, we do not believe admission of the evidence rendered the trial as a whole fundamentally unfair. The evidence defendant harbored the specific intent to kill at the time he shot Gao, Nhia, and Lee was overwhelming. Evidence suggesting the contrary was minimal. Particularly in light of the number of shots defendant fired, the vital portions of the victims' bodies that were struck, the fact defendant used multiple weapons, and the evidence he had been arguing with Gao immediately before the shooting and called Nhia by name during events, admission of defendant's uncharged postoffense misconduct cannot have affected the jury's finding of express malice, and so was harmless even under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 that is applicable to deprivations of due process (*People v. Malone* (1988) 47 Cal.3d 1, 22; compare *People v. Rogers* (2009) 46 Cal.4th 1136, 1167-1168 with *People v. Albarran*, *supra*, 149 Cal.App.4th at p. 232).

Under the more lenient standard for state-law error of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), however, the error was prejudicial with respect to the jury's

---

**40** A prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 88; accord, *People v. Hill* (1998) 17 Cal.4th 800, 820.)

findings of premeditation. Under *Watson*, the erroneous admission of evidence constitutes reversible error "if a reasonable probability exists that the jury would have reached a different result had [the] evidence been excluded. [Citations.]" (*People v. Whitson* (1998) 17 Cal.4th 229, 251.)

In the present case, evidence was presented concerning the effects of methamphetamine that fell short of hallucination. These included inability to control anger, hypervigilence, and, significantly, the effect on the portion of the brain responsible for executive functioning — planning, judgment, and organization. There was also evidence it was more common for a methamphetamine user to interpret reality as threatening than to hallucinate. In addition, there was evidence defendant loved Gao and was best friends with Nhia, and that defendant was known to point guns at people and even pull the trigger without actually shooting anyone. The jury was instructed, in accordance with section 29.4, that defendant's voluntary intoxication could be considered with respect to whether defendant acted with an intent to kill or with deliberation and premeditation. Defense counsel argued that if jurors believed defendant knew he was killing a human being, the most appropriate verdicts would be second degree murder.

Given the nature and quality of the evidence, we conclude it is reasonably probable that, had evidence of the postoffense jail incidents been excluded, at least one juror would have failed to find, beyond a reasonable doubt, that defendant premeditated and deliberated the shootings of Gao, Nhia, and Lee. As we recognized in *People v. Soojian* (2010) 190 Cal.App.4th 491, 521, for purposes of *Watson* review, "a hung jury is a more favorable result than a guilty verdict." Accordingly, the findings of premeditation and deliberation on counts I through III must be reversed. Because there was substantial evidence of premeditation, however, they can be retried.

In concluding reversal is required, we recognize the trial court twice instructed jurors concerning the limited purpose for which they could consider the evidence of the postoffense jail incidents. The court also instructed jurors they could not use the

40.

evidence for any other purpose, and could not conclude from it that defendant had a bad character or was disposed to commit crime.

We normally presume jurors follow such instructions. (*People v. Homick* (2012) 55 Cal.4th 816, 866-867; but see *People v. Robinson* (2005) 37 Cal.4th 592, 626.) There are, however, "times when the evidence is so potent or inflammatory that this presumption is overcome." (*People v. Dallas* (2008) 165 Cal.App.4th 940, 958.) This is one of those times. The prosecutor emphasized the limited purpose for which the evidence was admitted, but argued the jail incidents showed defendant knew what he was doing. The evidence so powerfully demonstrated defendant's violent character without regard to methamphetamine use, that it would be "the essence of sophistry and lack of realism" (*People v. Gibson* (1976) 56 Cal.App.3d 119, 130) to believe jurors were capable of following the limiting instructions and not using the evidence for an improper purpose when there was no permissible purpose for which the evidence could have been considered (see *People v. Hendrix*, *supra*, 214 Cal.App.4th at pp. 247-248; cf. *People v. Rogers*, *supra*, 57 Cal.4th at pp. 327-328, 332; *People v. Homick*, *supra*, 55 Cal.4th at pp. 866-867). A finding of premeditation as to each pertinent count was virtually assured once the evidence was so considered. Accordingly, the limiting instructions did nothing to lessen the prejudice.

In light of our foregoing analysis and conclusion, defendant's remaining claims of evidentiary error do not require extended discussion.

Defendant first contends the trial court committed reversible error by admitting evidence of defendant's prior threats and assaults with a gun on persons other than Gao. Those incidents were admitted, for the most part over defense objection on the ground they were more prejudicial than probative, to show intent.[41]

---

[41] The trial court excluded the prosecutor's proffered inclusion of an incident in which defendant shot an AR-15 into the air on the Fourth of July.

Gao and Lee both were victims of the charged offenses. Defendant's prior uncharged misconduct toward them thus had probative value with respect to intent, even though he did not kill them on any of the prior occasions. (See *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1612-1614.) In light of this fact and that the testimony concerning the prior misconduct was no stronger or more inflammatory than that concerning the charged offenses, defendant fails to convince us the trial court abused its discretion in admitting the evidence. (See *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405; *People v. Linkenauger*, *supra*, at p. 1614.)[42] Assuming, without deciding, that the trial court erred by admitting incidents involving persons in addition to Gao and Lee, we conclude the error was harmless, whether considered singly or cumulatively with the error in admitting the postoffense misconduct. (See, e.g., *People v. Abel* (2012) 53 Cal.4th 891, 936; *People v. Pearson* (2012) 53 Cal.4th 306, 327; *People v. Smith* (2005) 35 Cal.4th 334, 373.)

Defendant also contends the trial court erred by prohibiting Sims from testifying to his own opinion that defendant was not malingering. Defendant says the error violated his federal constitutional rights to present a defense, to compulsory process, and to due process.[43]

The prosecutor sought to call Sims to testify concerning a conversation Sims had with Yufik. Defense counsel sought to ask Sims his opinion concerning whether defendant was malingering. The prosecutor opposed the request. An Evidence Code

---

[42] Defendant failed to object to testimony concerning Lee's desire not to go to the party. Given our conclusion, we need not address the Attorney General's claim of forfeiture with respect to this incident.

[43] Defendant's claim of prejudice is premised, in part, on his assertion Sims was a prosecution witness and so jurors would have found him more credible than Yufik, the defense expert. There is no evidence in the record to support defendant's proclamation jurors are "particularly skeptical" of experts hired by the defense. Law review articles and other similar secondary sources cited by appellate counsel in his briefs are not adequate substitutes.

section 402 hearing was held, during which Sims testified he administered tests to defendant to determine whether defendant was malingering, and concluded defendant was not malingering. The trial court ruled Sims could testify to the validity of the tests Yufik performed and Yufik's testing methodology, but not whether he believed defendant was malingering, because the issue was whether defendant was malingering when Yufik examined him.

Sims subsequently testified before the jury that he had a conversation with Yufik about defendant, in which Yufik spoke about Sims's and Yufik's expertise in methamphetamine-induced psychosis. During this conversation, Sims remarked that he (Sims) might have been called to testify in this case if he was an expert in crystal methamphetamine abuse, which he was not. Yufik replied, "Well neither am I, really."[44]

Sims explained that malingering is a deliberate attempt by a patient or defendant to pretend, for the purpose of achieving some kind of gain, that he or she has a particular mental disorder when he or she does not. Sims did not "take issue" with the tests Yufik administered with respect to malingering, with the caveat that a more comprehensive test was available. Sims would not have administered the TOMM in this case, because it was irrelevant since the focus here was not memory impairment. Sims agreed someone could be a liar without having a psychological diagnosis of malingering.

We conclude that if the trial court erred in precluding Sims from stating his opinion defendant was not malingering, the error did not implicate defendant's federal constitutional rights and was harmless under the applicable *Watson* standard. (See, e.g., *People v. McNeal* (2009) 46 Cal.4th 1183, 1203; *People v. Cunningham* (2001) 25 Cal.4th 926, 998-999; cf. *Crane v. Kentucky* (1986) 476 U.S. 683, 690; *Chambers v.*

---

**44** Yufik denied saying this to Sims and testified he told Sims he was not an expert in methamphetamine *research*. At trial, Yufik explained he was an applied scientist, not a research scientist, and did not conduct research himself. He had, however, read quite a lot concerning methamphetamine research.

*Mississippi* (1973) 410 U.S. 284, 302-303.) It was clear from Sims's testimony that Yufik administered appropriate tests on the subject (Sims even stated he could understand why Yufik may have chosen the M-FAST over the more comprehensive test in the interest of time and/or expedience), and nothing in Sims's testimony suggested he disagreed with Yufik's conclusion on the issue. Moreover, while the prosecutor attacked Yufik for failing to administer the TOMM, Sims's testimony supported Yufik's decision in that regard. None of defendant's statements to Yufik or to Sims were presented to the jury, and Yufik's diagnosis of methamphetamine-induced psychosis was based to a large degree on materials that had nothing to do with whether defendant was malingering at the time Yufik examined him several years after the shootings.

Under the circumstances, while it may have been, as defendant says on appeal, that "[e]verything depended on [defendant's] mental defense," the issue of malingering ultimately was not particularly significant, especially in light of the fact Sims never testified to a diagnosis of defendant, and both experts agreed someone could lie to them and not be diagnosed a malingerer.[45] We agree with the Attorney General that at most, the addition of Sims's proffered testimony would have shown defendant "was not malingering when both doctors evaluated him for mental disorders about four months apart over four years after the offenses. It would not have shown whether he was in a methamphetamine-induced psychosis at the time of his offenses. It also would not have shown that he did not necessarily lie to the doctors."

## II

### EXCUSAL OF JUROR[46]

---

[45]     We reject the notion the error, if any, went to "the heart of the defense."

[46]     In this and the following issue, we give a somewhat detailed background to afford a true picture of the trial court's rulings.

44.

Defendant next contends the trial court committed reversible error, as to all counts, by excusing Juror No. 10 for illness. We conclude the court acted well within its discretion.

## A.     **Background**

Trial was conducted Mondays through Thursdays. Prospective jurors were informed the trial was anticipated to last until February 11, 2014, although, by the time jury selection was completed, the trial court estimated they were about a week ahead of schedule.

On January 7, 2014, the trial jurors, along with three alternates, were sworn, and the evidentiary portion of trial began. Two days later, one of the alternate jurors was excused.

On the morning of Thursday, January 16, 2014, the court informed the parties it had received a message from the jury commissioner, saying Juror No. 10 could not be there that day because of an illness in the juror's family. The court assumed the situation would resolve itself by Tuesday.[47] As both counsel expressed a preference for having Juror No. 10 remain on the jury so as not to "burn" another alternate so early in the proceedings, in addition to which defendant was ill, it was decided the trial would be continued until Tuesday, January 21, 2014. The court warned however, that if Juror No. 10 had further difficulties the following week, it would excuse her. Defense counsel responded, "Absolutely."

Near the lunch recess on Wednesday, January 22, 2014, defendant requested that new counsel be appointed. Although the court denied the motion, it found it would be a miscarriage of justice to proceed with trial that afternoon. Accordingly, jurors were told to return Monday, January 27, 2014. On Monday morning, January 27, 2014, defendant again requested new counsel. After the hearing, the trial court stated its inclination to

---

[47]     Monday was a holiday.

45.

have the jury return the next day and to start then with defendant's testimony, so that defendant and counsel could have the afternoon to prepare.

The next morning, Tuesday, January 28, 2014, defendant unsuccessfully attempted to challenge the court for cause. After argument on an evidentiary matter, defendant unexpectedly announced he had decided not to testify. Defense counsel had no additional witnesses available for the day. He had planned to call Yufik after defendant testified, and Yufik could not be available for the next two days because of other professional commitments. Counsel stated he now needed to reevaluate everything to see if there were matters he hoped to present through defendant's testimony that he could not get in through other witnesses. The court rejected the prosecutor's argument that trial should proceed regardless of whether defendant had witnesses or was unable to present a defense, and ordered defense counsel to have Yufik present the following Monday morning, February 3, 2014, to testify. The court stated it was granting the continuance because the proceedings were still within the time frame the jury had been given, and Yufik's testimony had already been "pushed . . . back" from its original schedule.

Although Yufik testified for virtually the entire day on Monday, February 3, 2014, he did not complete his testimony. The next morning, Tuesday, February 4, 2014, the court informed counsel that Juror No. 10 "called in this morning. She is sick. Apparently has the flu, and cannot be here today. And it's my thought that with where we are, we need to get the trial moving. I don't know that it's a one-day illness. A lot of people have the flu, laid them up for several days, and I don't want to lose today, because then we lose additional time, perhaps. My thought is we ought to replace her with one of our alternates."

Defense counsel simply responded, "I object, submitted." The prosecutor stated he had no objection, because it was getting close to the end of trial, the jury had been given a date of February 11, 2014, and there were still two alternates left. Asked the basis of his objection, defense counsel replied: "Because we picked this jury. I think

46.

that, you know, this trial has been getting on longer and longer. I think there's no — I don't think there's any rush. February 10th was what we did [*sic*], and in our best estimate. Sometimes things take longer than we expect. I don't think there's any hurry, or rush to miss a day or two, whatever the case may be. Today is Tuesday. At most maybe missing probably three days. I don't know it'll take that long, and I don't see any need to remove her."

The court stated it did not know that Juror No. 10 was better or worse for either side. It had no notes from jury selection, and no indication the juror was pro-prosecution or pro-defense. The court did not see it as an issue of favoring one side or the other, and did not believe it would impact either side. It found it more important to get the case moving than to keep Juror No. 10, and so it ordered the name drawn of one of the remaining alternates to replace her.

The presentation of evidence concluded on the afternoon of Tuesday, February 4, 2014. The court and counsel spent the next day going over jury instructions outside the jury's presence. The court instructed the jury, and counsel gave their summations, on Thursday, February 6, 2014. The jury retired to deliberate at approximately 3:00 that afternoon. They returned their verdicts late the next morning.

**B.** **Analysis**

Defendant contends the trial court erred by "**precipitously**" replacing Juror No. 10, who, he claims, "**was likely favorably disposed toward [defendant's] mental-health defense**." He suggests the court made its decision without benefit of the relevant facts, and acted pursuant to a "blanket rule" it had declared in advance.

Section 1089 provides, in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then

47.

take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

" 'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 292.) " 'We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality.' [Citation.] 'The demonstrable reality test entails a more comprehensive and less deferential review' than is typical under the abuse of discretion standard. [Citation.] 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion . . .' that the juror was unable to perform his or her duties. [Citation.] Although a reviewing court will not reweigh the evidence, we 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.] In reaching that conclusion, we 'will consider not just the evidence itself, but also the record of reasons the court provides.' [Citation.]" (*People v. Debose* (2014) 59 Cal.4th 177, 200-201.) The heightened " 'demonstrable reality' " standard " 'more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 821.)

Applying the foregoing principles to the circumstances of the present case, we conclude the trial court did not abuse its discretion by discharging Juror No. 10. "A juror may be replaced if ill. [Citations.]" (*People v. Roberts* (1992) 2 Cal.4th 271, 324.) "In cases of illness, a court is not obligated to call a juror into court to substantiate his or her excuse and can rely on phone calls instead. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 560, fn. 15.) Indeed, calling the juror into the courtroom often would be unreasonable (see *People v. Dell* (1991) 232 Cal.App.3d 248, 256), and defendant does

not dispute that Juror No. 10 was, in fact, ill. The trial court did its duty by relaying the content of the telephone call to counsel, discussing the matter with them on the record, and stating its reasons for determining good cause existed to discharge the ill juror. (See *People v. Roberts, supra*, 2 Cal.4th at p. 325.) "The record supports the juror's disqualification for illness as a demonstrable reality, and no further inquiry was required under the circumstances." (*People v. Williams, supra*, 58 Cal.4th at p. 293; see, e.g., *People v. Duff, supra*, 58 Cal.4th at pp. 559-561; *People v. Smith, supra*, 35 Cal.4th at pp. 348-349 & cases cited.) "The demonstrable reality test does not demand of trial judges confronted with sick jurors that they elicit conclusive proof of the length of future incapacitation . . . . Nor does it demand that incapacitation exceed some preset length; in the right circumstances, an absence of a day or less may warrant excusal. [Citations.] Whether a juror's illness can best be accommodated by a continuance or replacement with an alternate is a matter committed to the trial court's discretion." (*People v. Duff, supra*, 58 Cal.4th at pp. 560-561, fn. omitted.)

Defendant argues the court excused Juror No. 10 due to the "blanket rule" it declared earlier, when the juror missed a day of trial due to an illness in her family. He claims the court's reference to the juror being replaced if she had "further difficulties" "plainly encompassed any further interruption . . . , not just a continuation of the current illness in the family." We do not read the record in such a cynical manner. It is readily apparent, from the context of the court's comments, that it was referring to the action it would take if the juror was still experiencing difficulties the following week, when trial resumed after the continuance the court was granting due to the juror's situation. In making its decision whether to permit further postponements in trial at the time Juror No. 10 herself became ill, the trial court properly could and did take into account the trial's progress to that point, including previous delays. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 986-987, abrogated on another ground as stated in *People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

In his briefs, defendant makes much of what, in his opinion, the trial court could or should have done. It is true the trial court could have taken a different course of action, such as waiting to see if Juror No. 10 could return after a couple of days and then hoping the juror did not spread her illness to the remaining jurors. Regardless, the fact alternative courses of action may have been available does not mean the trial court abused its discretion by choosing the course it did. (*People v. Smith*, *supra*, 35 Cal.4th at p. 349; *People v. Bell* (1998) 61 Cal.App.4th 282, 288-289.) "[W]hen, as here, a juror has good cause to be absent from trial for an indefinite period, the trial court does not abuse its discretion in replacing that juror with an alternate juror." (*People v. Smith*, *supra*, at p. 349.)

Despite the foregoing, defendant argues the trial court's action constituted federal constitutional error, because Juror No. 10 "likely" was leaning toward the defense. Defendant draws this conclusion about the juror because (1) she aspired to employment in the field of child development, and (2) she had a "low 'socioeconomic status.' "[48] Defendant's claim is based on mere surmise. That a prospective juror's employment as a social worker or in a similar field, or his or her socioeconomic status, might permit a prosecutor's exercise of a peremptory challenge against such a person to be deemed race neutral for purposes of analysis under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 (see, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 225-226, disapproved on another ground as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834; *People v. Cox* (2010) 187 Cal.App.4th 337, 347) does not make it *likely* he or she favored one side or the other for purposes of the argument defendant now makes. Moreover, that Juror No. 10 likely was *not* leaning toward one side or the other, despite her career aspirations and presumed low socioeconomic status, is suggested by the fact

---

[48] During voir dire, Juror No. 10 stated she was a part-time worker at Kohl's and planned to return to school. Her anticipated area of study was child development.

the prosecutor did not exercise a peremptory challenge against her. And, significantly, neither party disputed the trial court's statements in regard to the juror not being better or worse for either side.

Defendant says the likelihood Juror No. 10 was favorably disposed toward the defense explained why defense counsel "strenuously opposed" removing the juror, but we find nothing "strenuous" about defense counsel's opposition.[49] Nor is there even a hint in the record Juror No. 10's removal had anything to do with her views on the merits. (Cf. *U.S. v. Symington* (9th Cir. 1999) 195 F.3d 1080, 1088.)

In opposing discharge, defense counsel noted the parties had picked that jury, and defendant now claims he was "particularly prejudiced" because the discharge of Juror No. 10 and substitution of an alternate juror took place near the end of a long trial. It is "commonly known," he says, that attorneys adapt their presentations to the particular jurors in the case. While defendant had a fundamental constitutional right to a fair trial by an impartial jury, that right "[did] not entitle him to a jury composed of any particular individuals. [Citations.] '[W]here an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby.' [Citation.] This is so because alternate jurors are selected at the same time, are subject to the same qualifications and take the same oath as regular jurors. They hear the same evidence and are bound by the same rules and instructions as the regular jurors, and until the verdict is rendered they are at all times available and qualified to participate as regular jurors. [Citations.]" (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1486; accord, *People v. Abbott* (1956) 47 Cal.2d 362, 372.)

---

[49] Although, for our purposes, it is enough that defendant objected to the juror's removal, this is another instance in which appellate counsel has, at the very least, overstated what the record actually shows. There is a line beyond which proper advocacy becomes improper misrepresentation.

Because section 1089 does not offend the United States Constitution, our conclusion the trial court did not violate that statute necessarily disposes of defendant's claim of federal constitutional error. (*People v. Williams*, *supra*, 58 Cal.4th at p. 293.)

### III

### DENIAL OF POSTTRIAL *MARSDEN* MOTION[50]

Defendant contends he is entitled to a conditional reversal, and remand for a new hearing on his request for substitution of appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), because the court restricted its consideration of defendant's posttrial motion to ineffective assistance of counsel, without regard to the alternate ground of an irreconcilable breakdown in the attorney-client relationship. Defendant says the error also tainted the midtrial *Marsden* motions.

### A.    **Background**

Defendant initially was represented by the public defender's office. On May 3, 2010, defendant's first appearance following his arraignment in superior court, defendant moved for new counsel pursuant to *Marsden*. The motion was denied.[51]

On September 10, 2010, the deputy public defender assigned to defendant's case declared a possible conflict. On September 16, 2010, the public defender's office was relieved. On September 29, 2010, newly appointed counsel was relieved due to a conflict (representation of a victim in the case), and a third attorney was appointed. On October 1, 2010, that attorney was relieved due to a conflict. On October 5, 2010, Alonzo Gradford was appointed to represent defendant.

---

**50**    Unless otherwise stated, all proceedings referenced in this section of our discussion were presided over by the trial judge.

**51**    The reporter's transcript of this *Marsden* motion is not contained in the record on appeal. Defendant subsequently represented, in his motion to dismiss pursuant to section 995, that he made a *Marsden* motion during the preliminary hearing. That motion, which was not heard by the trial judge, was denied.

On June 8, 2012, defendant made an oral *Marsden* motion as to Gradford. Defendant asserted ineffective assistance of counsel in that Gradford was unprepared for trial and had not filed motions defendant desired, and was "sabotag[ing]" defendant's life. The trial court's ruling was set for June 11, 2012.

On June 11, 2012, defendant submitted a written *Marsden* motion as to Gradford. The trial court treated it as a continuation of the prior *Marsden* motion. A large part of the hearing consisted of defendant and Gradford arguing with one another. The motion was denied, whereupon defendant spat on Gradford at least twice. At the next court appearance, on June 14, 2012, Gradford was relieved as counsel at his own request and defense counsel was appointed.

On January 22, 2014, during presentation of the defense case to the jury, defendant made an oral *Marsden* motion with respect to defense counsel. Defendant stated he did not believe counsel was adequately cross-examining the witnesses or refreshing the witnesses' memories about their prior statements. He claimed counsel was not calling specific witnesses to testify for the defense, and represented counsel had never talked to him about testifying. He also asserted counsel was not arguing about evidence in defendant's favor that the prosecutor was hiding, or the number of interviews of defendant without him being read his *Miranda* rights.[52] Defendant also claimed defense counsel worked for the school district, where his job was to make sure bad people such as drug dealers or gangsters did not interfere; since defendant was a drug dealer and known gang member, this created a conflict. Defendant also complained counsel had never come and talked to him before or during trial, although counsel had sent his investigator to talk to defendant. Defendant said those were the main reasons he felt counsel was not representing him correctly, and he noted he had tried to tell counsel various pieces of

---

[52]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

information, but counsel "brush[ed defendant] off." Defendant then expounded on some of these complaints.

At the trial court's direction, defense counsel responded and explained why he had not conducted certain cross-examination or impeached certain witnesses, and why he had not called certain people to testify. He also explained why he had not gone into all of the circumstances concerning the police interview. With respect to his school board position, counsel stated he had stopped taking gang cases for a while because he thought there was a direct conflict, but there never was such a conflict in this case, and defendant had known about counsel's school board position for over a year without ever before raising the issue. Defense counsel conceded he had not yet had time to talk with defendant about testifying, because he had planned to do so over the lunch recess. Counsel stated he still wanted to have some time with defendant if given the opportunity.

Defendant responded by giving examples of why he believed counsel was not "doing his job the way he [said] he was." Defense counsel responded. Defendant then reiterated how little counsel had spoken to him about the case, and that counsel never really advised him about or prepared him for testifying. He claimed counsel was not fighting for him, and that it was because the court was favoring the People and not letting defense counsel represent defendant the way counsel wanted.

The court explained to defendant that it had watched both attorneys during trial, and that defense counsel had a number of tactical decisions to make, and had to make them immediately within the testimony of each witness. The court — having itself been a member of a different school board at one point — further explained a school board established policy and left it to the administrators to address subjects such as drug dealers on campus. The court noted school boards did not want any crime on campuses, but that would not prevent defense counsel from representing everyone, and, with respect to defendant being a gang member, this was not a gang trial. The court found defense counsel had given defendant "good representation from start to finish," and it explained

54.

to defendant why defense counsel had decided not to impeach a particular witness. It denied the *Marsden* motion, but decided it would not have defendant testify that day, in order to give him time to spend in preparation and discussing other potential witnesses with defense counsel.

Defense counsel warned defendant that what happened with Gradford was not going to happen again. Defendant agreed and stated he felt respect and gratitude for defense counsel, but simply felt counsel was not representing him effectively.

Trial was continued to the following Monday, January 27, 2014. That morning, defendant made another *Marsden* motion. Before the hearing, defense counsel represented he and his staff spent approximately six hours with defendant over the weekend, and some of defendant's complaints about counsel's performance were different than those previously raised.

Defendant presented a written motion for substitution of counsel in which he alleged, by means of checking boxes on a form, that counsel failed and/or refused to (1) confer with defendant concerning preparation of the defense, (2) communicate with defendant, (3) subpoena witnesses favorable to the defense, (4) perform critical investigation, (5) secure and present expert witnesses, (6) prepare and file motions critical to the defense, (7) impeach prosecution witnesses, (8) present evidence at motion/writ hearings critical to the defense, and (9) declare prejudice and/or conflict against defendant, as a result of which defense counsel had taken on the role of a surrogate prosecutor. In an attached declaration, defendant asserted counsel was not providing adequate representation and, due to conflicts that existed between defendant and counsel, defendant could not and would not receive adequate representation. Defendant asserted counsel had lied to and misled defendant, particularly with respect to seeking a new judge due to the trial court's bias against defendant arising out of the court witnessing defendant's attack on Gradford. Defendant further asserted he had instructed counsel to file a petition for writ of habeas corpus to preclude use of defendant's prior juvenile

55.

strike and other adjudications, and to file a section 995 motion to challenge the prosecutor's theory and to "attack" criminal intent and premeditation and gang affiliation. Defendant also instructed counsel to file a motion challenging the prosecutor for misconduct, bias, racism, and illegal investigations, and challenging court decisions and all prejudicial evidence illegally obtained. Defendant complained about defense counsel's refusal to have another expert examine the mental health issues with respect to defendant's insanity plea, and asserted counsel lied to him about the sanity phase of trial and by advising him that he would be hurting his defense if he did not withdraw his insanity plea. Defendant also asserted defense counsel refused to subpoena witnesses favorable to the defense, including defendant's mother, brother, neighbor, girlfriend's sister, and ex-girlfriend; and refused to subpoena the prosecutor's witnesses to testify upon defendant's behalf about defendant's mental state. Defendant asserted counsel confused the statements of a witness that was called with statements made by that witness's son, and failed to impeach, thoroughly cross-examine, and refresh the memories of prosecution witnesses. Defendant claimed counsel had refused to declare "prejudice, bias and conflict" against defendant, and so had taken on the role of a surrogate prosecutor against defendant's interests. Defendant claimed defense counsel was rushed into trial by the prosecutor and court, and, because he was busy running for school board, had little time to go over discovery and the preliminary hearing transcript with defendant. Defendant claimed counsel apologized for not filing motions to suppress or exclude irrelevant evidence. Defendant concluded his declaration by stating he felt there was enough evidence to establish ineffective assistance of counsel, as well as a conflict of interest and conflict between defendant and counsel, "to where there is no trust nor communication between" defendant and counsel.

At the hearing on his motion, defendant essentially read his written declaration. He added that defense counsel had told him he (counsel) was wrong, felt the trial court

56.

was biased against defendant, and thought they were not supposed to have that trial judge.

The court responded it would be surprised if counsel thought that, since in that county, once a judge was assigned to a case, he or she stayed with the case to completion unless removed for some reason. The court also denied being prejudiced against defendant, and noted it had had defendants spit on their attorneys before. The court noted defendant had been a gentleman since then, and observed that up until the last couple of days, it had thought defendant was getting along fine with defense counsel. The court stated it considered defendant "just another Defendant," and, when defendant claimed what happened with Gradford "plant[ed] a little seed in" the court's mind, the court responded, "But it doesn't affect my rulings."

Defendant contended defense counsel should have moved to exclude illegally obtained evidence, specifically his interrogation, which was done in violation of defendant's *Miranda* rights, and also the photographs of defendant throwing gang signs and holding a gun. Defendant claimed defense counsel had lied about what motions had been filed and heard during the afternoon defendant was not present because he was ill. He also claimed defense counsel had told him there was nothing counsel could really do to help defendant. Defendant stated there was no more communication and no more trust between him and counsel, and if his *Marsden* motion was granted, he was going to hire a lawyer so he could receive a fair trial and effective assistance of counsel.

Defense counsel responded that he never told defendant he would seek a new trial judge. Counsel also represented that he told defendant he did not believe the court was biased, in addition to which counsel was aware of no case law that allowed a defendant's own misconduct in court to get that defendant a different judge. Defense counsel denied having any discussion about filing habeas actions or motions to strike juvenile adjudications, and asserted he was filing motions that were consistent with the rules of evidence, counsel's professional responsibility, and counsel's years of experience.

57.

Counsel denied lying about the insanity process, and stated what he had told defendant and his strategy in that regard. With respect to the witnesses defendant wanted called, counsel represented that after the last *Marsden* hearing, he had contacted all those witnesses again and gone over their statements with them. Counsel summarized those conversations, his discussion with defendant on the issue, and his strategy and reasons for not having the persons testify. Counsel denied mixing up the source of certain statements and explained how he knew who had made the statements and why counsel did not refresh that person's recollection. Counsel denied apologizing to defendant for not having enough time to represent him due to the school board election; according to counsel any such assertion was false.

As for the interrogation video, counsel represented that defendant told him for the first time the day before the current *Marsden* hearing, that defendant told detectives multiple times that he wanted to see his lawyer. Counsel responded that if defendant invoked and the interrogation proceeded and counsel missed that, defendant was correct that he had been prejudiced by the interrogation coming before the jury. As a result, counsel rewatched the video, and determined that at no point did defendant ask for an attorney. Counsel also noted that he had sought to exclude the photograph of defendant with a gun, but the court ruled it was admissible. Counsel explained that when that happened, he accepted the court's rulings and moved on.

Counsel asserted that he did his best to prepare defendant to testify, but when counsel went to see defendant, defendant berated counsel for the bulk of the time. They did have a constructive dialogue concerning defendant's testimony. Counsel stated he believed their relationship was "horrible," and that instead of his first priority being to make objections, his first priority now was his own safety. Counsel concluded: "And even still, Your Honor, at this stage I don't believe that the breakdown, if there is any, of our trust, or what have you, it's caused by him, Your Honor. And it doesn't give him the

right, from my perspective, to stop this trial. [¶] I have a duty to represent him, and I will represent him to the best of my abilities."

Defendant responded by accusing defense counsel of lying and by reiterating his original claims. The court then questioned defense counsel again about alleged confusion between two potential witnesses. After counsel responded, the court observed that defendant said communication and trust were broken, and that trust was not an issue in a *Marsden* proceeding, but communication was. It then asked if counsel had talked to defendant about testifying that afternoon. Counsel responded that he had; however, defendant refused to listen as counsel was giving him advice and, when defendant asked if he could just get up and tell his own story, they discussed the possibility of defendant representing himself. As long as he was represented, however, counsel made the tactical decisions.

The court stated defendant had not shown grounds for having counsel replaced, and that if defendant worked with counsel, defendant would receive a fair trial and effective assistance of counsel. After further discussion about defense counsel's decision not to call defendant's desired witnesses because each of them would "tank" defendant, the court reiterated that defendant had not made the necessary showing, and so defense counsel would continue to represent him and defendant would testify that afternoon. Defendant then asked for two or three hours of time with defense counsel to thoroughly prepare his testimony. The court gave him the afternoon.

The next morning, counsel — at defendant's instruction — sought to disqualify the trial judge for cause. The defense asserted the court was biased because it had witnessed defendant's behavior toward Gradford, and because its rulings unfairly favored the People. The court denied any bias and denied the motion.[53] A short time later,

---

[53]    The matter subsequently was presented to a judge from another county who was sitting by assignment. That judge found defendant's challenge to be without merit.

defendant announced he had decided not to testify. He explained: "The reason why I don't want to testify is because I feel like there's prejudicial inside this courtroom, and bias inside this courtroom. And I'm not going — and I'm not going to get a fair trial. And, due to this courtroom's decisions that I'm not going to get a fair trial, and also, due to ineffective assistance of Counsel and lack of communication, and broken down communication, and trust I'm not . . . I refuse to . . . continue on with — with ineffective assistance of counsel, due to bad, broken down communication and trust, and due to the — due to the prejudicial and bias in this courtroom and this courtroom's decisions on ruling and et cetera." (*Sic.*)

Near the conclusion of the defense case, the court again advised defendant of his right to testify, and asked if it was still his position that he did not wish to do so. Defendant confirmed that decision and that it was based on the court's perceived unfairness and bias, ineffective assistance of counsel, and "broken down communication" between defendant and defense counsel.

The jury returned its verdicts on Friday, February 7, 2014. After the jurors were released, the court and counsel discussed scheduling of possible motions and sentencing. Defense counsel stated that if, after reviewing the transcript of the trial, he did not see the basis for a new trial motion, he would notify the court and prosecutor in time to set a sentencing date and notify the affected family members. Defendant then requested a *Marsden* hearing. The court set the hearing for the following Monday.

At the *Marsden* hearing, defendant complained that he did not know how many grounds he needed to get the trial court to grant one of his *Marsden* motions. He noted the court had refused to remove Gradford even after Gradford requested that he be relieved, and that was when the "incident" took place in the courtroom. Defendant asserted that after that incident, the court became even more biased against him. Defendant noted he had filed two *Marsden* motions against defense counsel for "lack of communication, no communication, broken down trust, ineffective assistance of counsel

60.

due to very little knowledge about my case" and due to other reasons such as failure to file motions, failure to object to statements made by witnesses, and failure to properly cross-examine witnesses. Defendant asserted counsel also failed to refresh witnesses' recollection concerning past statements, and failed and refused to call upon witnesses that he interviewed and subpoenaed to come and testify. Defendant stated counsel's excuse that their statements were not good for the defense was "total bull crap," and he asked what the point was of interviewing and subpoenaing those witnesses without calling them. According to defendant, counsel's trial strategy was to help the prosecutor convict defendant of first degree murder and do very little work on the defense. Defendant also asserted counsel failed to address and challenge all motions granted or denied, was ineffective and had little knowledge about the case, had had no communication with defendant, had no understanding of trial strategy, misled and lied to defendant.

Defendant asserted that despite his raising those issues, the court denied his prior *Marsden* motions. Defendant stated he knew the court did not like him and was prejudiced against him, and even had defendant shackled and restrained during trial. Nevertheless, defendant asked the court to hear him out and relieve defense counsel. Defendant claimed counsel was working as a surrogate prosecutor to obtain a first degree murder conviction. As an example, he pointed to the prosecutor asking Yufik when he interviewed and tested defendant, and defense counsel refusing to object when Yufik replied that he interviewed defendant for five and a half hours at the jail. Defendant asserted defense counsel probably coached Yufik to mention defendant was in jail, so as to "open up a window" for the prosecutor. In addition, defendant claimed counsel did a poor job fighting against admission of the jail incidents, and he accused the court of prejudice and bias in admitting the evidence.

Defendant claimed closing argument proved defense counsel was ineffective. He criticized counsel for not arguing about the interview with House, the fact defendant was under the influence, or that prior to the interview, defendant did not know Gao, Nhia, and

Lee were shot. Defendant asserted defense counsel never argued on defendant's behalf or introduced video clips of defendant acting crazy or talking to himself, and never showed defendant the entire video of the interrogation. Defendant asserted defense counsel stated in argument that Lee had defendant's gun and was using defendant's phone all night, which was a false statement by counsel and showed counsel's lack of knowledge concerning the case. Defendant claimed defense counsel also lied to the jurors by saying defendant did not go anywhere after the killings, when in fact defendant went across the street and the jurors knew that. Defendant also criticized counsel for not telling jurors defendant's car was parked outside the house where the shootings occurred, and that if defendant had planned the killings and wanted to escape, he would have gotten his keys and driven off, but he did not because he was under methamphetamine-induced psychosis and did not have the requisite mental state to plan anything nor did he intend to kill any human being, but rather was hallucinating and thought he was fighting and shooting demons and demon tigers. Defendant claimed counsel did not mention anything about methamphetamine-induced psychosis.

Defendant also claimed counsel did not argue the fact Lee never mentioned anything prior to trial about Gao and defendant arguing about having sex. Defendant stated he told counsel to object, because the prosecutor needed a motive for the killings and coached Lee to say that, but defense counsel never argued the point on defendant's behalf. Defendant asserted defense counsel "sold [defendant] out to the jurors" and that everything defense counsel had done showed the lack of communication and ineffective assistance of counsel and little knowledge about the case. Defendant further claimed that, at the end of the trial, defense counsel stated in court that he did not think defendant had sufficient grounds for a "retrial" motion.

Defendant concluded by stating he had the right to effective assistance of counsel. He asserted there was no communication between him and defense counsel, and that counsel manipulated him and did what he (counsel) wanted. Defendant claimed counsel

62.

sold him out due to prejudice and bias against defendant because defendant was a gangster and drug dealer, and part of counsel's other job was to keep people like defendant out of the community and school districts. Therefore, due to ineffective assistance of counsel, no communication, conflict of interest, and conflict with counsel, defendant asked for new counsel for "retrial" and appeal motions.

Defense counsel responded that after the last *Marsden* hearing, he rewatched the interrogation video multiple times, and at no point did defendant ask to have an attorney present. Accordingly, there were no grounds for a suppression motion. Counsel pointed out he had explained, in the last *Marsden* hearing, why he did not impeach one of the defense witnesses, and how the witnesses defendant wanted called would not have benefited the defense. As for lying about filing motions, counsel represented he had given defendant copies of all written motions counsel had filed, and had informed him about all oral motions made in court and placed on the record later in chambers. Counsel denied apologizing to defendant and stated he had nothing to apologize for, as he had zealously pursued defendant's defense. Counsel agreed with defendant that some of the court's rulings — particularly admission of the jail incidents — were prejudicial, but counsel tried to put on the best defense he could and preserve the issues in light of the rulings. Counsel represented he had specifically talked to Yufik about the court's rulings and limitations, including the issue of jail, then Yufik let slip that he spoke to defendant at jail. At that point, counsel felt, "That cat was out of the bag." As far as the interrogation interview, counsel stated he had watched the entire thing and there was nothing that would have been helpful to defendant in front of the jury. Counsel represented there was an approximately 15-minute segment in which defendant was "acting a little strange" and in which defendant appeared to be masturbating. Counsel felt that although it showed defendant was "kind of in a different place," it did nothing to help his case because it would have shown the jury that within hours of the death of his

girlfriend, he spent 10 to 15 minutes "with his hand in his groin." That was not something defense counsel could show to the jury, and he had informed defendant of that.

As far as closing argument, defense counsel admitted he mistakenly said defendant lent his gun to Lee when he meant phone. In context, however, what he meant was clear. Defense counsel had attempted to go through the trial testimony step by step, and, as for Lee, tried to make the jury see it was unbelievable someone who had a gun pulled on them earlier would stay when there was an opportunity to flee.

Defense counsel represented that he had been open and honest with defendant at each stage of the proceedings. He conceded it hurt to hear lies said about him, but, if so ordered, he would continue to do everything he could to represent defendant consistent with his 15 years of experience as a lawyer and his understanding of the rules of professional conduct.

Given the opportunity briefly to respond, defendant accused defense counsel of again lying. He "begg[ed]" the court for new counsel for his "motion of retrial or motion of appeal," and stated that all he and defense counsel did was argue, and even in trial, there was no communication.

The court wanted time to think about the matter and do some research on the applicable law, and so continued the matter for its ruling. After the continuance, the following occurred:

> "[THE COURT:] The . . . case is on for ruling on the Marsden hearing. Based on my research, including *People v. Redd* [*sic*], 183 Cal.App.4th, 1137, at 1144 and 45, in order for me to substitute new counsel at this point, I would need to essentially find that there is a good argument that [defense counsel] was ineffective at trial. We've been through that several times.

> "[Defense counsel], the only concerns that have been raised had to do with tactical decisions. Those are certainly within the purview of [defense counsel]; and I don't believe he was ineffective, so the Marsden will be denied.

"THE DEFENDANT:  But how — I mean, [defense counsel], I mean, he made false statements, you know, to the jurors.  You know what I'm saying?  He even lied to the jurors and . . . last week he never even mentioned anything about him lying to the jurors.  You know what I'm saying?  He never answered that.

"THE COURT:  I don't think he lied to the jurors.

"THE DEFENDANT:  No.  He told the jurors saying I never left the spot of the killing.  You know?  He said I got arrested at the spot of the killing, which it was a false statement.

"THE COURT:  That is not enough to relieve him; so he'll represent you for the Motion For New Trial.  When it goes on appeal, you'll have new counsel."

## B.    Analysis

Defendant contends he is entitled to a conditional reversal for a new *Marsden* hearing, because the trial court restricted its consideration of defendant's posttrial *Marsden* motion to ineffective assistance of counsel, without regard to the alternate grounds of an irreconcilable breakdown in the attorney-client relationship.  Additionally, he says, this error tainted the two midtrial *Marsden* motions.  The Attorney General responds that the trial court impliedly considered and rejected both grounds, so defendant is not entitled to a remand and there was no error to taint the midtrial motions.  We agree with the Attorney General.

"[C]riminal defendants are entitled under the Constitution to the assistance of court-appointed counsel if they are unable to employ private counsel.  However, the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney."  (*Marsden*, *supra*, 2 Cal.3d at p. 123.)

The applicable rules are settled.  " ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to

relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record *clearly* shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would '*substantially* impair' the defendant's right to effective assistance of counsel. [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 681, italics added, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Taylor* (2010) 48 Cal.4th 574, 599; *People v. Smith* (2003) 30 Cal.4th 581, 604; *Marsden*, *supra*, 2 Cal.3d at p. 123.)

The same standard applies whether the *Marsden* motion is made preconviction or postconviction. (*People v. Smith* (1993) 6 Cal.4th 684, 694.) " 'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]' [Citation.]" (*Id.* at pp. 692-693.) Despite the use of the phrase "colorable claim," which originated in *People v. Stewart* (1985) 171 Cal.App.3d 388, 396-397 (*Stewart*), the California Supreme Court has made it clear that "[a] defendant has no greater right to substitute counsel at the

66.

[postconviction] stage than the [preconviction stage]." (*People v. Smith*, *supra*, at p. 694.)[54]

In the present case, defendant moved to discharge defense counsel and have new counsel appointed to bring a motion for new trial based at least in part, presumably, on ineffective assistance of counsel. (See *People v. Lucky* (1988) 45 Cal.3d 259, 281.) Thereafter, the trial court afforded him ample opportunity to explain the reasons for his request. (See *People v. Vera* (2004) 122 Cal.App.4th 970, 979.) Accordingly, we review the denial of defendant's motion for abuse of discretion. (*People v. Memro* (1995) 11 Cal.4th 786, 857.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

We conclude the trial court's ruling was reasonable, both with respect to counsel's purported inadequacies and any irreconcilable conflict between client and counsel. As it had in the multiple previous *Marsden* hearings, the court patiently permitted defendant to fully state his claims, seeking clarification and offering explanation where necessary. It inquired of defense counsel, who responded point by point, and then solicited defendant's response. "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' [Citation.]" (*People v. Smith*, *supra*, 6 Cal.4th at p. 696.) "The record makes plain that counsel [was] representing defendant diligently and well." (*People v. Memro*, *supra*, 11 Cal.4th at p. 857.)

"We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements. [Citations.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 922.) It is apparent from the record that defendant's claims of inadequate representation and

---

[54] *Stewart* has been disapproved to the extent its language implies a different rule than that of *Marsden*. (*People v. Smith*, *supra*, 6 Cal.4th at pp. 694, 696.)

breakdown of the attorney-client relationship had their basis primarily in tactical disagreements between defendant and counsel. " ' "[T]actical disagreements between the defendant and his attorney do not . . . constitute an 'irreconcilable conflict' " ' unless they portend a complete breakdown in the attorney-client relationship. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 912.)

We recognize defendant purported not to trust counsel. This did not compel the court to appoint new counsel, however, as the California Supreme Court has stated, "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1246.)

Moreover, " '[a] trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel . . . .' [Citation.]" (*People v. Clark*, *supra*, 52 Cal.4th at p. 913.) In light of the procedural history of this case with respect to defendant's *Marsden* motions, which we have set out at length — particularly the motions' number and timing, and defendant's inclusion of assertions that demonstrably either were untrue or involved a decided skewing of the facts — the trial court reasonably could conclude replacement of counsel was not required because any breakdown in the attorney-client relationship that had occurred was due to defendant's own attitude and refusal to cooperate. (*People v. Clark*, *supra*, at p. 913; *People v. Taylor*, *supra*, 48 Cal.4th at p. 600; see *People v. Smith*, *supra*, 30 Cal.4th at p. 607.) "[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict. [Citation.]" (*People v. Smith*, *supra*, 6 Cal.4th at pp. 696-697.)

" 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the

defendant.' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 729.) Counsel "need not do everything the defendant may personally desire, no matter how unmeritorious or possibly even harmful to the overall defense. Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances. [Citation.]" (*People v. Freeman* (1994) 8 Cal.4th 450, 509.)

Defense counsel did so here. Clearly, however, defendant wanted to be "captain of the ship" without representing himself. He sought to manipulate and control both his attorney and the proceedings, and moved to substitute his attorney or disqualify the trial judge when things did not go his way. He was capable of cooperating with counsel, but made the choice not to do so, and the trial court was well aware of this. The court did everything it could to ease defendant's dissatisfaction, distrust, and concern short of appointing yet another attorney to represent defendant. In light of the number of attorneys with whom defendant had expressed dissatisfaction — violently on at least one occasion — over the course of proceedings, the trial court reasonably could conclude *no* attorney would have sufficed to cure the problem. (Cf. *Brown v. Craven* (9th Cir. 1970) 424 F.2d 1166, 1169-1170.) The trial court was not required to countenance defendant's attempted manipulation of the court system, and neither are we. (See *People v. Trujillo* (1984) 154 Cal.App.3d 1077, 1087; *People v. Hill* (1983) 148 Cal.App.3d 744, 762.)

Defendant contends, however, that the trial court never considered whether substitution of counsel should be granted due to an irreconcilable breakdown in the attorney-client relationship, but rather restricted its consideration of defendant's motion to ineffective assistance of counsel. (See *U.S. v. Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, 777-779.) We disagree.

" 'It is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties. [Citations.]' [Citation.]" (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456; accord, *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.) " ' "A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. . . ." ' [Citation.]" (*People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7; accord, *People v. Carpenter* (1999) 21 Cal.4th 1016, 1046.)

Defendant's arguments to the contrary notwithstanding, we find these presumptions unrebutted. First, the trial court had shown, in a prior *Marsden* hearing, that it was well aware an irreconcilable breakdown in the attorney-client relationship constituted grounds for substituting counsel.

Second, the trial court cited *People v. Reed* (2010) 183 Cal.App.4th 1137, 1144-1145 (*Reed*), the pertinent portion of which states:

> "On this point, the *Stewart* court stated: '[I]n hearing a motion for new trial based on incompetence of trial counsel, the trial court must initially elicit and fully consider the defendant's reasons for believing he was ineffectively assisted at trial. In so doing, the court must make such inquiries of the defendant and trial counsel as in the circumstances appear pertinent. If the claim is based upon acts or omissions that occurred at trial or the effect of which may be evaluated by what occurred at trial the court may rule on the motion for new trial without substituting new counsel. If, on the other hand, the claim of incompetence relates to acts or omissions that did not occur at trial and cannot fairly be evaluated by what occurred at trial, then, unless for other good and sufficient reason the court thereupon grants a new trial, the court must determine whether to substitute new counsel to develop the claim of incompetence. New counsel must be appointed when the defendant presents a colorable claim that he was ineffectively represented at trial; that is, if he credibly establishes to the satisfaction of the court the possibility that trial counsel failed to perform with reasonable diligence and that, as a result, a determination more favorable to the defendant might have resulted in the absence of counsel's failings.' (*Stewart*, *supra*, 171 Cal.App.3d at pp. 396-397.) The trial court

here made no inquiry at all. That lack of inquiry constitutes reversible error." (Fn. omitted.)

In a footnote immediately following the *Stewart* quotation, *Reed* states: "In [*People v.*] *Smith*[, *supra*, 6 Cal.4th 684], the Supreme Court clarified that the 'colorable claim' and 'possibility' language in *Stewart* does not create a lesser postconviction standard for substitution of counsel. The Supreme Court held 'that the standard expressed in *Marsden* and its progeny applies equally preconviction and postconviction.' ([*People v.*] *Smith*, *supra*, 6 Cal.4th at pp. 693-694.) '[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]. This is true *whenever* the motion for substitute counsel is made.' (*Id.* at p. 696.)" (*Reed*, *supra*, 183 Cal.App.4th at p. 1145, fn. 14.)

It would be speculative to assume the trial court did not read and consider this footnote. That the court did not expressly refer to it does not change this fact; the footnote fell within the portion of the opinion specifically cited by the court and dealt with precisely the issue the court was researching. Even if, as defendant now claims, "[i]t is hardly uncommon for a lower court . . . to misinterpret or entirely overlook a footnote in an opinion," that other courts may have done so from time to time does not establish *this* trial court did so on *this* occasion.

Third, defendant was seeking new counsel to bring a new trial motion based on ineffective assistance of trial counsel. Thus, the court's statement it would "need to *essentially* find that there is a good argument that [counsel] was ineffective at trial" (italics added) is neither an incorrect statement of the law, nor does it rule out the court's

71.

consideration of an irreconcilable breakdown as part of its assessment of the issue. As stated *ante*, the California Supreme Court has decreed the irreconcilable conflict must be such " ' "that ineffective representation is likely to result." ' [Citation.]" (*People v. Roldan*, *supra*, 35 Cal.4th at p. 681; accord, *People v. Taylor*, *supra*, 48 Cal.4th at p. 599; *People v. Smith*, *supra*, 30 Cal.4th at p. 604.) Thus, the ground of an irreconcilable breakdown in the attorney-client relationship is not wholly divorced from the ground of ineffective assistance of counsel, particularly when the issue is raised postconviction.

Defendant could be very volatile, and was not above using physical aggression to get his way. The trial court was well aware of this. While it may have been preferable for it to rule expressly on both the ineffective assistance of counsel and the irreconcilable conflict grounds for substitution of counsel, we cannot fault it, under the circumstances, of choosing not to anger defendant further by accusing him directly of manipulation or expressly placing on him the responsibility for his conflict with defense counsel.

We reject defendant's claim the trial court erred by failing to consider the irreconcilable breakdown basis for a substitution of counsel. The record shows the court was aware of that ground, and does not refute the conclusion the court implicitly considered and rejected it.

## IV

### COUNT IV

The complaint filed against defendant on July 22, 2009, did not contain a charge in which Xay was alleged as the victim. After Xay testified at the preliminary hearing and recounted the incident in which defendant pointed a handgun at her immediately following the shootings, however, the People filed an information that added count IV, an assault charge with respect to Xay. In both the original and first amended informations (both of which were signed by the trial prosecutor), the cover sheet (which gave the code sections for the charges and enhancements) described this count as assault with a deadly

72.

weapon in violation of section 245, subdivision (a)(1), with an enhancement pursuant to section 12022.5, subdivision (a). In the body of both informations, this count read:

> "**COUNT IV**: The said **TOU VANG XIONG** on or about the 20th day of July, 2009, at and in the County of Stanislaus, State of California, and prior to the filing of this Information, did willfully, unlawfully, and feloniously commit an assault with a deadly weapon, to wit, **GUN**, upon **XAY YANG**, a human being.

> "**ENHANCEMENT**: During the commission of the above said offense, defendant personally used a firearm, in violation of section 12022.5(a) of the California Penal Code."[55]

At the time the charged offenses were committed, section 245 provided, in pertinent part:

> "(a)(1) Any person who commits an assault upon the person of another with a deadly weapon or instrument *other than a firearm* or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years . . . .

> "(2) Any person who commits an assault upon the person of another *with a firearm* shall be punished by imprisonment in the state prison for two, three, or four years . . . ." (Italics added.)

Defendant contends that by referencing subdivision (a)(1) of section 245, count IV of the information charged him with assault with a deadly weapon *other than a firearm*.[56] He says his conviction on this count must now be reversed, because there was no substantial evidence he used a weapon other than a firearm. To allow the conviction to stand, he says, would permit him to be convicted of a charge on which he was never tried. The Attorney General perceives the error as a clerical one, and argues we should amend

---

[55]    Because the information and first amended information are the same in this regard, we refer to them both as "the information."

[56]    Assault with a deadly weapon other than a firearm and assault with a firearm have been proscribed by different subdivisions of section 245 since 1982. (§ 245, as amended by Stats. 1982, ch. 136, § 1, p. 437, eff. Mar. 26, 1982, operative Apr. 25, 1982; see Historical and Statutory Notes, 47F West's Ann. Pen. Code (2014 ed.) foll. § 245, p. 182.)

the conviction to assault with a firearm under subdivision (a)(2) of section 245. We conclude defendant is not entitled to reversal of his conviction.

Defendant's basic legal proposition is correct: "A person cannot be convicted of an offense, not charged against him in the indictment or information, whether or not there was evidence at trial to show that he committed the offense. [Citation.]" (*People v. Puckett* (1975) 44 Cal.App.3d 607, 611; see *Cole v. Arkansas* (1948) 333 U.S. 196, 201 ["It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."].)

From there, however, defendant's argument flounders, because it proceeds from the proposition assault with a deadly weapon (§ 245, subd. (a)(1)) and assault with a firearm (*id*., subd. (a)(2)) are "mutually exclusive" and "two separate crimes." The California Supreme Court rebuffed this argument in *People v. Milward* (2011) 52 Cal.4th 580, 584, 585. Although the court declined to decide whether the offenses should be considered as constituting a single crime — aggravated assault — for determining the lesser included offenses of the crime of aggravated assault by a life prisoner (*id*. at p. 586; see § 4500), it noted that prior to the 1982 amendments to section 245, the Legislature made no distinction between aggravated assaults committed with firearms and those committed by other means. In amending section 245, subdivision (a) to create subparagraphs (1) and (2), "the Legislature's apparent purpose was to require a *minimum* punishment of six months' imprisonment in county jail for aggravated assaults committed with a firearm (§ 245, subd. (a)(2)), but not for aggravated assaults committed by other means (§ 245, subd. (a)(1))." (*People v. Milward*, *supra*, at p. 585.) Significant for our purposes is the high court's observation that "the statutory phrase 'other than a firearm' is not an element of section 245's subdivision (a)(1), which punishes an assault with a deadly weapon 'other than a firearm' or by means likely to inflict great bodily injury; *a*

*defendant who commits an assault with a firearm violates that subdivision*." (*Id*. at p. 587, original italics omitted, italics added.)

In *People v. Maldonado* (2005) 134 Cal.App.4th 627, the issue before the appellate court was whether assault with a firearm was a predicate offense, under section 186.22, subdivision (e), for the gang enhancement (*id*., subd. (b)(1)). In this regard, subdivision (e)(1) of section 186.22 listed, as a predicate offense, assault with a deadly weapon or by means of force likely to produce great bodily injury, "as defined in Section 245." The court concluded assault with a firearm fell within the purview of section 186.22, subdivision (e)(1), noting "[s]ection 245 treats assault with a firearm as an aggravated subset of assault with a deadly weapon." (*People v. Maldonado*, *supra*, at p. 634.) As a result, the court concluded, "[I]n the scheme of section 245, assaults with a firearm are treated as an especially dangerous type of assault with a deadly weapon, entitled to greater punishment. Hence, section 186.22, subdivision (e)(1), which includes 'assault with a deadly weapon . . . as defined in Section 245,' necessarily encompasses assault with a firearm under section 245, subdivision (a)(2). In other words, 'as defined in Section 245,' assault with a deadly weapon broadly covers the subset of assault with a firearm." (*Id*. at p. 635, fn. omitted; see *People v. Myers* (2007) 148 Cal.App.4th 546, 554 [guilty plea in Arizona to charge of assaulting victim with deadly weapon or dangerous instrument, to wit, handgun, satisfies elements of assault with firearm under § 245, subd. (a)(2)].)

There is some support for the notion the two subparagraphs of section 245, subdivision (a) state distinct crimes. (See *People v. Gonzalez* (2014) 60 Cal.4th 533, 535 [oral copulation of unconscious person (§ 288a, subd. (f)) and oral copulation of intoxicated person (*id*., subd. (i)) constitute different offenses]; *People v. Aguilar* (1997) 16 Cal.4th 1023, 1033 [if weapon clause of § 245, subd. (a)(1) included assault with firearm, § 245, subd. (a)(2) would be rendered "a redundancy, a result [courts] strive to avoid under recognized canons of construction"]; but see *People v. Moore* (1986) 178

Cal.App.3d 898, 903-904 [prosecution not precluded, by more specific provisions of § 245, subd. (a)(2), from charging assault with firearm under § 245, subd. (a)(1) if it so elects], disapproved on another ground in *People v. Ledesma* (1997) 16 Cal.4th 90, 101, fn. 5.)  Even if we were to so conclude, however, we would reject defendant's claim his conviction on count IV must be reversed.

The information in the present case charged defendant with "willfully, unlawfully, and feloniously commit[ting] an assault with a deadly weapon, to wit, **GUN**," on Xay.  It was only the caption of the pleading, which summarized the charges, that mentioned subdivision (a)(1) of section 245.

"Notice of the specific charge against a defendant is the constitutional right of the accused.  [Citation.]  The defendant is entitled to be apprised with reasonable certainty of the nature of the crime charged so that he may prepare his defense and plead jeopardy in future prosecutions.  [Citation.]" (*People v. Puckett*, *supra*, 44 Cal.App.3d at p. 611; accord, *Cole v. Arkansas*, *supra*, 333 U.S. at p. 201.)  Nevertheless, "[a]n information is formally sufficient if, in substance, it charges the defendant with the commission of a public offense in words 'sufficient to give the accused notice of the offense of which he is accused.'  [Citation.]  To be material, a variance between the information and proof must be 'of such a substantive character as to mislead the accused in preparing his defense, or . . . likely to place him in second jeopardy for the same offense.'  [Citations.]" (*People v. Braddock* (1953) 41 Cal.2d 794, 799.)  "[A] valid accusatory pleading need not specify by number the statute under which the accused is being charged.  [Citations.]" (*People v. Thomas* (1987) 43 Cal.3d 818, 826.)  Even a reference to the wrong statute may be viewed as surplusage and of no consequence.  (*Ibid*.; *People v. Schueren* (1973) 10 Cal.3d 553, 558; *People v. Reddick* (1959) 176 Cal.App.2d 806, 820; see *People v. Jackson* (1961) 191 Cal.App.2d 296, 302-303.)

Defendant was on notice he was being charged with assault with a deadly weapon, to wit, a gun, and, by virtue of the section 12022.5, subdivision (a) enhancement

76.

allegation, that he had to be prepared to defend against the prosecution's theory he personally used a firearm during the assault. Assault with a deadly weapon where the weapon is a gun and assault with a firearm have the same elements. (Compare *People v. Cook* (2001) 91 Cal.App.4th 910, 920 with *People v. Elwell* (1988) 206 Cal.App.3d 171, 177 & *People v. Roshid* (1961) 191 Cal.App.2d 692, 693.) "A gun capable of being fired is a deadly weapon. [Citation.]" (*People v. Roshid*, *supra*, at p. 694; accord, *People v. Sandoval* (1963) 222 Cal.App.2d 348, 351.) "Defendant did not demur to the information as he might have done if he believed that this language failed to state the offense adequately to give him notice. [Citations.] The well-established rule is that failure to demur on the ground that a charging allegation is not sufficiently definite waives any objection to the sufficiency of the information. [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 672.)

Defendant would have us believe he was misled to his detriment by being placed on notice "not that he would be tried for assault with a firearm, but rather that he would be tried for assault by means of force likely to produce great bodily injury, using a firearm as the instrument of the potential great bodily injury." Such an interpretation of the charging language strains credulity, and we will not countenance it. It is an "established rule" that " '[n]otice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate . . . .' [Citations.]" (*People v. Holt*, *supra*, 15 Cal.4th at p. 672.) As previously described, Xay testified at the preliminary hearing to the conduct giving rise to count IV. Under the circumstances, "[a]ssuming the information was ambiguous, defendant could not have been misled. The preliminary hearing evidence gave defendant ample notice of the charge against which he was required to defend. [Citation.]" (*People*

*v. Price* (1991) 1 Cal.4th 324, 398; accord, *People v. Griggs* (1989) 216 Cal.App.3d 734, 743; see *People v. Peyton* (2009) 176 Cal.App.4th 642, 659.)[57]

Here, the information charged defendant with assaulting Xay with a gun. The undisputed evidence showed an assault with a firearm on Xay. Defendant's defense to that charge was the same as with respect to the other charges, and the record suggests no way in which a different defense could have been proffered in that regard. The jury was instructed on the law consistent with assault with a firearm and on all elements of that offense pursuant to CALCRIM No. 875, the prosecutor argued defendant assaulted Xay with a firearm, and the jury expressly found defendant guilty of assault with a deadly weapon "as charged in Count IV of the information" and that he personally used a firearm during the commission of that offense.

"When a jury finds guilt after being instructed on all elements of the charged crime . . . , the jury has made all the findings that due process requires. If a jury instruction requires the jury to find guilt on the elements of the charged crime, a defendant will have had a 'meaningful opportunity to defend' against the charge. [Citation.]" (*Musacchio v. United States* (2016) 577 U.S. ___ [136 S.Ct. 709, 715].)

" ' " 'A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court.' [Citations.]" [Citations.] "The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [Citation.]" [Citation.] "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]" [Citation.]' [Citations.]" (*People v. Jones* (2014) 230 Cal.App.4th 373, 378-379.)

---

[57] *People v. Mancebo* (2002) 27 Cal.4th 735, 739, 749, on which defendant relies, deals with a completely different subject — the pleading and proof requirements of the One Strike law — and so does not assist him.

Here, defendant was charged with assaulting Xay with a firearm. The jury's intent to convict of that crime was clear. Defendant's substantial rights suffered no prejudice from the designation of subdivision (a)(1) instead of (a)(2) of section 245 in the information or on the verdict. Accordingly, we disregard the technical defect in the verdict (see, e.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1259; *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272-1274; *People v. Reddick*, *supra*, 176 Cal.App.2d at p. 821) and order correction of the corresponding clerical error in the abstract of judgment.

## DISPOSITION

Defendant's convictions of first degree murder on counts I and II and premeditated attempted murder on count III are reversed unless the People accept a reduction of the convictions to second degree murder on counts I and II and unpremeditated attempted murder on count III. After the filing of the remittitur in the trial court, the People shall have 30 days in which to file a written election to retry defendant. If they do not timely file such an election, and/or do not bring defendant to retrial on the premeditation and deliberation elements within the time set forth in Penal Code section 1382, subdivision (a)(2) — 60 days unless waived by defendant — the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect convictions of second degree murder on counts I and II and unpremeditated attempted murder on count III, and shall resentence defendant accordingly. Whether following retrial or resentencing, the abstract of judgment shall show defendant was convicted, in count IV, of violating Penal Code section 245, subdivision (a)(2), assault with a firearm.

In all other respects, the judgment is affirmed.

                                               _____

                                                 DETJEN, J.

WE CONCUR:


_____

KANE, Acting P.J.


_____

PEÑA, J.